Thomas O. CAMPBELL, and Mary F. Campbell, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 73-2059.

United States Court of Appeals, Sixth Circuit.

Decided Oct. 23, 1974.

William R. Bagby, Lexington, Ky., for petitioners-appellants.

Lawrence B. Gibbs, Acting Chief Counsel, I. R. S., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Elmer J. Kelsey, Charles E. Anderson, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before EDWARDS, McCREE and MILLER, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from a decision of the United States Tax Court sustaining certain deficiencies with respect to appellants' income tax liability for the years 1962, 1963, and 1964. A number of issues are presented for our consideration, several requiring the interpretation and application of sections 165 and 1231 of the Internal Revenue Code, and two concerning the authority of the Commissioner to redetermine expenses and depreciation schedules. The tax court held in favor of the Commissioner on all issues and we affirm its judgment.

The significant facts may be stated briefly. Appellants Thomas O. Campbell and Mary F. Campbell, husband and wife, filed joint income tax returns for their taxable years 1962, 1963 and 1964. During this time, appellants were in the business of growing tobacco and raising thoroughbred horses on farms that they owned and operated under the names, Home Farm, Haddix Farm, and Hibernia Farm.

Four boxwood and four magnolia trees located around taxpayers' personal residence were destroyed by a hard freeze in 1963. None of the trees was insured. Although the taxpayers asserted they were entitled to deduct the $2300 loss as a casualty under section 165, the tax court held that under the then existing section 1231 the loss could only be used to offset gains from sales of property used in the trade or business.

During the taxable year 1964, taxpayers, in connection with their business, purchased for $450 an interest in a thoroughbred race horse named West River. The horse had to be destroyed in the same year because of a painful bowed tendon. As a result of this event, taxpayers claimed a full casualty loss under section 165, but the tax court held that the loss could only be used to offset capital gains under § 1231.

Driftwood, a horse purchased by Mary F. Campbell in 1961 for $6,000 as a personal riding and show horse, was destroyed by a veterinarian in 1962 because it suffered from laminitis. Taxpayers again claimed a casualty loss but the tax court held that they had failed to carry the burden of proof to establish their right to this deduction.

In addition to Driftwood, taxpayers, during the years in question, owned another horse for their personal use. These two horses (only one after Driftwood died in 1962) grazed and pastured on appellants' farm during eight months of the year when the weather permitted. The tax court found that taxpayers had deducted from ordinary income the expenses for maintaining these horses kept for non-business purposes. From the fact that appellants boarded horses for others and charged as much as $125 per month in 1970, the tax court concluded that the expense of maintaining the two horses kept for personal use was at least $75 per month and that the total deduction claimed for horse maintenance should be reduced by that amount.

Appellants acquired the Home Farm in 1943, and in 1944 they placed a useful life of 25 years on the buildings. In 1957, appellants acquired Hibernia Farm and established a depreciation schedule for certain improvements on it. The Commissioner increased the useful life of these business assets, and the tax court sustained the Commissioner's action.

The first question is whether a loss of $2300 from the destruction of taxpayers' magnolia and boxwood trees is deductible in full under § 165(c)(3) or should be limited under § 1231 because of the gain from the conceded sale of other property used in their business.

The amount of such a casualty loss could be deducted in 1963 from ordinary income under § 165(c)(3) unless § 1231 applied. If it applied, the loss would have to be considered as a loss from the sale of a capital asset held for more than six months, and taxpayers would be limited to fifty percent of the $2300. Taxpayers contend that § 1231(a) required the offset of a personal casualty loss only against gains from an *involuntary conversion* of property used in business and that it need not be offset against gains from the *sale* of property used in business.[1] Under taxpayers' contention, only gains from involuntary conversions of business property or capital assets should be considered in determining whether personal casualty losses should be accorded capital asset treatment or be deductible as ordinary losses, and since they had no gains from invol-

---

1. Section 1231(a) as it existed in 1964, provided:

(a) General Rule—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

(1) in determining under this subsection whether gains exceed losses, the gains de-

scribed therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and

(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion.

In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft.

untary conversions during the years in question, the entire $2300 should have been deductible under section 165.[2]

This court had occasion to interpret § 1231(a) in Morrison v. United States, 355 F.2d 218 (6th Cir.), cert. denied, 384 U.S. 986, 86 S.Ct. 1887, 16 L.Ed.2d 1004 (1966). The taxpayer sustained a loss to her personal residence, including trees and shrubbery from an ice storm. In the same year, she realized a gain from the sale of an orange grove held by her for income producing purposes. We held that the taxpayer's loss must be offset against the gain from the sale of the orange grove under section 1231(a), and refused to segregate the gains and losses resulting from the involuntary conversion of business or personal assets from the gains or losses from the sale of business property.

In E. Taylor Chewning, 44 T.C. 678 (1955), affirmed per curiam, 363 F.2d 441 (4th Cir. 1966), cert. denied, 385 U. S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966), the taxpayers' boxwood bushes were destroyed by a severe snowstorm. During the same taxable year, the taxpayers reported gains from the sale of breeding cattle in excess of the loss from the destruction of the boxwood bushes. They contended that they were entitled to deduct the loss from the destruction of the bushes from their ordinary income. The tax court determined that the loss was not deductible in full, and stated:

It is our conclusion that, except in the case of property used in the trade or business or capital assets held for the production of income, casualty losses are subject to the provisions of section 1231, as amended, whether or not compensated for by insurance in any amount.

We hold therefore, that the respondent properly determined that the loss sustained by the petitioners with respect to the boxwood bushes is not deductible as an ordinary loss under section 165(c)(3), but must be applied against the petitioners' gain from sale of breeding cattle, pursuant to the provisions of section 1231. 44 T.C. at 683.

In a second effort to avoid the application of § 1231 appellants argue that the present § 1231 would permit the taxpayer to take a deduction from ordinary income, and that the present statute is merely a clarification of the statute as it existed for the taxable years in question. The present statute, as amended by P.L. 91–172, provides:

> In the case of any involuntary conversion (subject to the provisions of this subsection but for this sentence) arising from fire, storm, shipwreck, or other casualty, or from theft, of any property used in the trade or business or of any capital asset held for more than 6 months, this subsection shall not apply to such conversion (whether resulting in gain or loss) if dur-

2. The pertinent part of Section 165 provides:
  *(a) General rule.*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
  *(b) Amount of deduction.*—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
  *(c) Limitation on losses of individuals.*—In the case of an individual, the deduction under subsection (a) shall be limited to—
  (1) *losses incurred in a trade or business;*
  (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.

ing the taxable year the recognized losses from such conversions exceed the recognized gains from such conversions.

Thus, had this case arisen under the new statutory language, taxpayers would be able to claim a full casualty loss against ordinary income because there was no involuntary conversion resulting in a gain in the years in question. However, the statute as it existed in 1964 did not set off involuntary conversion gains against involuntary conversion losses. Instead, it provided that a casualty loss was meant to be offset by gains resulting from both the sale and the involuntary conversion of other property used in the trade or business or capital assets held for the production of income.

Any doubt on this point is resolved by the Senate Committee Report concerning the 1969 amendment to § 1231(a):

> Another problem which has arisen under Section 1231 involves the basic scope of the section; namely, whether it is applicable to casualty losses on uninsured personal assets, such as a taxpayer's personal residence or nonbusiness automobile. The 1958 amendment does not apply if the destroyed property, whether or not completely uninsured, is a capital asset not held for the production of income or, in other words, a personal asset. *In enacting this amendment, it appears Congress believed these uninsured casualty losses were subject to section 1231 and thus had to offset capital gains under the section, rather than being fully deductible against ordinary income.* In initiating the 1958 amendment excluding uninsured casualty losses on business property from Section 1231, this committee stated (S.Rept. 1983, 85th Cong., p. 204): "On the other hand, the amendment does not apply to loss arising from the destruction or theft of the taxpayer's uninsured personal automobile." This would indicate that it was felt such a loss was otherwise included under sec-

tion 1231. (Emphasis added). 1969–3 Cum.Bul. at 553–54.

■ Accordingly, we affirm the tax court's determination and hold that a personal casualty loss occurring in 1963 must be offset against gains from the sale of property used in the business.

The second issue presented is whether a $450 loss from the destruction of a horse, West River, because of severe pain caused by a bowed tendon is fully deductible against ordinary income under § 165(a) or is limited under § 1231 to reducing taxpayers' capital gains from the sale of property used in their business. Because of a stipulation that the horse was property used in the trade or business of taxpayers, the sole issue is whether the destruction of the horse was a casualty. If it was a casualty, the loss would be deductible in full under § 1231(a) which provided for the year in question that:

> In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft.

A casualty is defined as "an event due to some sudden, unexpected, or unusual cause," Matheson v. Commissioner, 54 F.2d 537, 539 (2nd Cir. 1931), instead of a condition resulting from gradual deterioration or disease. Burns v. United States, 174 F.Supp. 203 (N.D. Ohio 1959), affirmed, 284 F.2d 436 (6th Cir. 1960).

■ Here, the cause of the bowed tendon is not known. Thomas Campbell testified that he did not know how the horse developed a bowed tendon and there is other testimony that the horse had a "weak leg", a condition which hardly could be classified as a casualty. The tax court held there was no proof to show that the destruction of the horse constituted a casualty loss, and since the

burden is upon the taxpayer to prove entitlement to a deduction, the claim was disallowed. We agree and affirm the tax court's determination.

The next issue is whether the taxpayers may deduct as a casualty under § 165(c)(3) their $6,000 loss of a horse kept for personal use. This horse, Driftwood, was destroyed in 1962 because it developed a case of laminitis. The appellants' expert witness, a veterinarian, characterized laminitis as an inflammation of the laminae which are the membranes located between the sensitive and insensitive structure of the hoof of a horse. The affliction is caused by overexertion on hard footing and often is secondary to conditions such as digestive disturbances and bio-chemical changes resulting from overeating or overdrinking. In this case, drugs did not halt the inflammation and the laminae began to separate. This in turn caused the coffin bone, which is the bone inside the hoof, to rotate and penetrate the sole of the hoof. Because of the severe pain from the exposure of this bone, the horse had to be destroyed.

On the basis of the veterinarian's testimony classifying laminitis as a disease, the tax court held that its onset was not a casualty within the meaning of § 165(c)(3). The tax court observed that an argument very similar to taxpayers' was rejected by this court in Burns v. United States, 284 F.2d 436 (6th Cir. 1960), affirming per curiam 174 F.Supp. 203 (N.D.Ohio 1959). In Burns, an elm tree that became infected with Dutch Elm disease was removed in obedience to a municipal ordinance. The taxpayer owners claimed a casualty loss, but then District Judge Paul C. Weick held against them stating:

> While it is true that the tree was removed within a relatively short period of time, the reason for its removal was the disease which would have ultimately caused its death. The action of the ·disease is a progressive one
> . . . .
> In my judgment, loss occasioned by disease, however contracted, is not a

casualty within the meaning of the statute. 174 F.Supp. at 210.

■ There is ample evidence in the record to support a finding that Driftwood suffered from a disease which caused his demise, and there is no evidence that the cause was "sudden, unusual, or unexpected." We agree with the statement that:

> Were "other casualty" delimited in its application to include ordinary, commonplace forms of loss of personal property, the resulting administrative and practical difficulties would not be difficult to imagine. The judicial tendency to limit "other casualty" to sudden, unexpected and unusual events similar to fires, storms and shipwreck has the practical advantage of confining personal losses to somewhat dramatic settings which are susceptible to identification and verification by the administrative authorities. Bercaw v. Commissioner, 8 T.C. 1361, affirmed, 165 F.2d 521 (4th Cir. 1948).

Since the laminitis did not occur in a "dramatic setting which [is] susceptible of identification and verification" we affirm the tax court's decision.

■ Next we consider whether the tax court erroneously upheld the Commissioner's disallowance of that portion of a claimed business deduction allocable to the maintenance of two horses kept for personal use. It is clear that the deduction of the expenses of maintaining animals kept for personal rather than business purposes is not permitted.

The tax court agreed with the Commissioner's estimate of $2850 calculated at $75 for each month a personal horse was kept. This determination was based in part on the fact that the taxpayers charged as much as $125 per month for boarding horses in 1970. Taxpayers argue that "there is no evidence in the record that the personal horses received the same care as did taxpayers' business horses." The burden of proof to show the existence of legitimate expenses is on the taxpayer, and the tax court deter-

mined that appellant failed to prove the amount of the claimed lesser cost.

■ Taxpayers' figure was based on $0.30 a day for feed during the winter when the horse(s) were unable to graze in the field. Appellants introduced no evidence that would indicate that none of the itemized business expenses (e. g., for watering, stabling, veterinary services and blacksmith services) should be attributable to the personal horses, and it is undisputed that Driftwood was treated for laminitis. Accordingly, we agree with the tax court that taxpayers failed to establish their claimed deduction.

Finally, we consider whether the Commissioner erred in redetermining the useful lives of certain farm buildings used in taxpayers' business. The tax court upheld the Commissioner's redetermination. On appeal, taxpayers contend that the revenue agent made the redetermination in 1966 without discovering if there had been repairs made to the buildings after the taxable years in question, and that the agent never saw one of the farms for which he redetermined the useful life.

■ When there is a significant change in the useful life of an asset and there is a clear and convincing basis for the redetermination of its useful life, a change in the useful life of the asset may be made. Cohn v. United States, 259 F.2d 371 (6th Cir. 1958), Reg. 1.-167(a)-1(b). However, a taxpayer who claims error in an IRS redetermination of his depreciation deduction must prove not only the error, but also that the deduction claimed by him is reasonable.

In general, proof offered for that purpose must adequately show the cost or other basis of the property, its useful life, its salvage value, the extent to which it was previously depreciated, and the method and computation of the depreciation. Pohlen v. Commissioner, 165 F.2d 258 (5th Cir. 1948); Lightsey v. Commissioner, 63 F.2d 254 (4th Cir. 1933); 2 Prentice Hall Federal Taxes, Depreciation, ¶ 15,411, ¶ 15,413(5).

■ With respect to taxpayers' first contention that the agent considered repairs made after the taxable years in question, we hold that the burden of proof was on the taxpayers to show that the revenue agent erred in increasing the useful life of an asset. From the record, it appears that the revenue agent personally visited taxpayers' properties, inspected the depreciation schedules and determined that the useful life of the farm assets should be extended. At this point, it was necessary for the taxpayers to show that the agent's calculation was incorrect. If the taxpayers adduced no such proof, the tax court could properly find that there was a clear and convincing basis for the redetermination.

■ However, taxpayers contend that the agent never saw one of the farms for which he determined the useful life. If this statement is true, then taxpayers would have shown that there was no "clear and convincing basis" to support the redetermination. However, the judge of the tax court heard the testimony of the agent, and although she made no express finding that the agent viewed the Hibernia Farm, the evidence would have supported such a finding.[3]

3. On direct examination, Agent Pullen testified:
A The Hibernia farm, as of January of 1966, when my examination was conducted, some of the assets were fully depreciated at that time and some had approximately two years remaining.
On cross examination the following colloquy occurred:
Q Which farm did you go to first?
A The home farm.
Q And then where did you go?
A To my knowledge, it was all around the home farm and then along Hume Road

which—in which—at which time he pointed out the property that was sold to Mr. Raley. Whether or not the Hibernia farm was covered during that tour, I'm not certain at this time.
Q And, then, you don't know whether or not you went to the Hibernia farm?
A It was my impression that the tour I had covered all of his farm properties.
Q Did you drive over these farms?
A I rode with Mr. Campbell in his car, yes.
Q You say it's just an impression? That you took this tour?

And her holding that the redetermination was not erroneous rests implicitly on a finding that the agent had a basis for making it. The tax court applied the correct standard and held that there was a clear and convincing basis for the redetermination. We affirm its decision.

The judgment in all respects is affirmed.

A  Beg your pardon?

Q  Did you say you took the tour or is it just an impression you took the tour?

A  No, I took the tour. There's no doubt about it.

Q  You said there was an impression. You had an impression about going to the Hibernia Farm.

Q  Do you recall whether or not you went to the Hibernia Farm?

A  It was my impression, sir, that the tour that I had covered all of Mr. Campbell's farm property. What I said was that this time I am not sure or certain that this plat that you have in evidence includes the Hibernia Farm. That's what I said.

Q  But you don't know whether or not you were on the Hibernia Farm, do you?

A  I thought I was on all of his farm property. If it's on the plat, I'm sure I was.