ARTHUR C. COLEMAN AND JANICE H. COLEMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10892–79.     Filed April 8, 1981.

*Joseph Falcone*, for the petitioners.
*Clyde W. Mauldin*, for the respondent.

PARKER, *Judge*: Respondent determined a deficiency in petitioners' 1977 Federal income tax in the amount of $1,592.25. Concessions having been made, the only issues remaining are

whether or not petitioners are entitled to a casualty loss deduction under section 165(c)(3)[1] for the loss of an elm tree infected with Dutch elm disease, and if so, the amount of that loss.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, filed a joint Federal income tax return for the calendar year 1977 with the Internal Revenue Service in Cincinnati, Ohio. At the time of filing their petition in this case, they resided in Birmingham, Mich.

Arthur C. Coleman (hereinafter sometimes referred to as petitioner) was a registered professional engineer and an officer in several high technology corporations. These corporations were involved in supplying high technology products to the automotive industry for air pollution and control measurement. In his work, petitioner was accustomed to reading and assimilating technical and scientific data. However, the record does not establish that he had any specific knowledge of Dutch elm disease, other than the fact that the principal visible symptom was "flagging," which will be discussed below.

In August 1970, petitioner purchased a home located at 960 Mohegan, Birmingham, Mich., for which he paid approximately $54,500. Mohegan was a tree-lined street with some 100 trees, including 6 or 7 elms, located both across and down the street from petitioner's home. At that time, there were 2 trees in petitioner's front yard, a maple tree on the left side of the house and an elm tree on the right side. The elm was about 60 feet tall with a trunk some 30 to 34 inches in diameter. It is the loss of this elm that is involved in this case.

Dutch elm disease is caused by the fungus, Ceratocystis ulmi, and is the most destructive shade-tree disease in North America.[2] Since first being discovered in the United States in

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.

[2]Most of the findings of fact in regard to the disease and the disease carriers are based upon a publication by the U.S. Department of Agriculture, entitled "Dutch Elm Disease and it's Control," which the parties stipulated into evidence. Petitioners called as an expert witness, a Dr. John Arend, and respondent called a Mr. Darrell Middlewood, the Superintendent of Parks

Cleveland, Ohio, in 1930, Dutch elm disease has spread to 42 States, including the State of Michigan. Dutch elm disease has caused extremely heavy losses of elm trees throughout these States.

All trees have some fungi and there are several hundred varieties that can affect trees. However, the Dutch elm disease fungus works in the translocation system or water-conductive tissues of the tree, plugging up and cutting off the water supply of the tree, and eventually killing the tree from lack of water. Trees affected by Dutch elm disease develop a brown discoloration in the water-conducting vessels of the wood, which can be seen by cutting a diseased branch of the tree. Dutch elm disease, however, can be positively diagnosed only through a laboratory test of a specimen from the suspected tree. The principal visible symptom of Dutch elm disease is a wilting and yellowing or drying of foliage, sometimes called "flagging." The "flagging" is usually followed by defoliation and the death of the affected branches. Dutch elm disease is one of several vascular-wilt diseases attacking elm, all of which produce similar symptoms, and only a laboratory test can determine if Dutch elm disease fungus is present. However, Dutch elm disease fungus may not be found in the particular specimen tested at the laboratory even though the tree is in fact infected with the disease.

The visible symptoms of Dutch elm disease usually appear first on one or several branches and then spread to other parts of the crown (top) of the tree. Sometimes, however, the entire tree may suddenly develop symptoms. Trees infected with Dutch elm disease may die quickly within a few weeks, or gradually, branch by branch, over several years. As indicated above, a specimen taken from one part of the tree may produce negative laboratory test results even though the tree is in fact infected with the fungus. Dutch elm disease fungus cannot be identified by a visual inspection, and the presence or absence of Dutch elm

---

and Recreation in the city of Birmingham, Mich. Neither witness had any specific knowledge about Dutch elm disease. Although Dr. Arend is a forest tree pathologist, his testimony was very vague, generalized, and frequently unresponsive to the questions asked by counsel and the Court. Mr. Middlewood did not purport to be an expert on Dutch elm disease, but testified about the Dutch elm disease control program in the city of Birmingham, Mich., for which he had administrative responsibility.

disease in a tree cannot be established by a visual inspection of the tree.

Dutch elm disease fungus can be transmitted from tree to tree by two methods: by certain beetles and by root grafts. The principal carriers of the fungus in the United States are the European elm bark beetle and the native elm bark beetle, the former having now displaced the native beetle and now being the more common vector. These beetles feed primarily on the bark of healthy elm trees, primarily on the 2- to 4-year-old twig crotches. Healthy elms are readily attacked for eating but rarely for breeding. These beetles breed in dead or dying elm wood with intact bark. If the dead or dying tree or wood in which they are breeding is infected with the Dutch elm disease fungus, as it frequently is, then the beetles carry the fungus spores on and in their bodies, thereby infecting the healthy tree on which they feed.

The elm bark beetles breed throughout the spring and summer months in dead or dying trees, and they feed on healthy elms throughout the entire growing season of the elm from about May to September. Beetles go through the winter months in a larval stage and emerge from the bark of the trees as adults as early as April when the elms break dormancy. When they emerge, the beetles leave clearly visible "emergence holes" in the tree bark, and some 400 beetles can emerge from a square foot of bark. As soon as the adult beetles emerge, they begin the feeding and breeding cycle, which is repeated throughout the growing season. During the summer, complete development of the beetle (from egg to larva to pupa to adult beetle) takes 6 to 8 weeks. Therefore, there can be two or perhaps three generations in a season, depending on the weather and the particular geographic area.

As indicated above, because feeding beetles may carry the Dutch elm disease fungus on and in their bodies, they can cause a healthy tree to become infected. The highest disease incidence results from the beetles' spring and early summer feeding. Spores of the Dutch elm disease fungus introduced into the spring-wood vessels are carried rapidly to other parts of the tree. Usually, trees that become infected in the spring or early summer die quickly; however, those that become diseased in late summer may not die until the following year.

The record does not show how quickly or at what stage a tree

can be considered to be infected with Dutch elm disease once the fungus-carrying beetles begin feeding on a healthy tree. Apparently, it depends to some extent upon where the fungus is introduced into the tree. If the Dutch elm disease fungus is introduced at the tip of a branch, the fungus may spread sufficiently to cut off the water supply within 30 days and "flagging" will become evident. Occasionally, it is possible at that stage to stop the disease by cutting off the diseased branch or branches. The fungus spores can, however, get into the main water transportation system of the tree and spread like a cancer throughout the tree, affecting the entire tree internally before any externally visible signs appear. Although Dutch elm disease can spread rather rapidly throughout a tree, the record does not show how rapidly or what period of time might be considered normal.

Another, but a less common, method of transmitting Dutch elm disease is through root grafts. If the roots of an infected tree graft with those of a healthy tree, the fungus may spread through these grafts. Generally, the spread of the disease through root grafts can only occur when the healthy elm is located within 35 to 50 feet of an infected elm.

Federal and State workers have conducted research on Dutch elm disease since 1931 and have attempted to control the disease since shortly after its discovery in this country. Although these efforts have not been particularly successful, there are four methods currently used to try to combat Dutch elm disease: (1) Reducing the population of beetles through sanitation and tree care to eliminate or remove dead or dying elm material required for breeding; (2) protecting healthy elms from feeding beetles by spraying the trees with insecticides; (3) preventing underground transmission of the fungus from a diseased tree to adjacent healthy trees by destroying all grafted roots; and (4) planting trees which are resistant to the disease.

Various insecticide sprays have been developed to control the elm bark beetle population. Methoxychlor is one such spray which, when used properly, has been highly successful in reducing the spread of Dutch elm disease by reducing the number of beetles. The trees must be sprayed thoroughly, particularly the upper part of the tree, before the beetles become active in the spring. Applications made anytime during the dormant period (fall, winter, or early spring) will remain

effective during the period of bark beetle activity. However, later applications after the trees break dormancy and after the beetles emerge in the spring will be effective for only short periods of time. When elm trees are properly sprayed with Methoxychlor before beetle activity begins, the chances of beetles feeding upon them are reduced, and chances of the trees contracting the Dutch elm disease are reduced.

However, if an elm tree has already been infected with the Dutch elm disease fungus prior to being sprayed with the insecticide, the Methoxychlor will have no effect, since it works only on the beetles. There is no evidence that Methoxychlor or other insecticides reduce or control the spread of the fungus itself. However, some fungicides have been developed, such as Correx, Arbotect 20's, and Lignasan. Some tree experts recommend the use of chemical fungicides, but the effectiveness of these fungicides as either preventive or curative agents is uncertain. Although these chemicals are experimental and without guarantee of a cure or remission, they have occasionally been successful in stopping the spread of Dutch elm disease in a tree. However, the city of Birmingham, Mich., warns homeowners against injecting healthy elm trees with Lignasan or other chemical fungicides, but advises that fungicide injections may be considered for an infected elm tree if the tree shows approximately 5-percent infection level.

For the past 20 to 30 years, Dutch elm disease has been a common problem in the Birmingham, Mich., area. Since the first elm tree was diagnosed as having the disease, the city has been involved in a program aimed at the control or attempted control of the disease. This program begins in February of each year when a survey of all homes in the city is taken in an attempt to locate all elm wood where the beetles may breed. After this, around the first of April, all elm trees are sprayed with Methoxychlor. Starting about May 15th, and continuing through the summer, the city conducts Dutch elm disease surveys by having inspection crews drive throughout the streets looking for visual signs of the disease. If a city-owned tree shows symptoms of the disease or is dead or in an advanced state of decline, it is immediately removed without laboratory testing. If a privately owned tree shows symptoms, it is "red tagged" and a specimen is removed from the tree for laboratory analysis. If the results are positive, the homeowner is notified that his tree has Dutch elm

disease. The homeowner then has 10 days to remove the tree, unless he obtains a written permit to delay removal to try to treat the tree. The homeowner may apply within 5 days to the Superintendent of the Department of Parks and Recreation for a permit to treat the tree in conformance with a method approved by the superintendent. If such a permit is obtained, the homeowner can attempt to treat the tree in accordance with the prescribed method, but if the treatment is ineffective, the tree must then be removed at the homeowner's expense.

As a part of what it describes as its "war with Dutch elm disease," the city of Birmingham has maintained records of elm losses due to Dutch elm disease. These records show that over the period from 1952 through 1979, of the estimated 8,000 privately owned elms recorded at the beginning of the period, some 4,440 elm trees were lost due to Dutch elm disease, including the 207 elm trees lost in 1977, the year involved in this case. The figures shown for privately owned elms are reasonably accurate figures since the privately owned trees were usually laboratory tested before removal was ordered, unless they were already dead or in an advanced state of decline. There are similar figures for city-owned elms, but these figures may not be as accurate as those for privately owned trees, since city-owned trees were not laboratory tested but were simply removed if they were dead or otherwise showed signs of Dutch elm disease. However, the record clearly establishes that over the years, many elm trees in Birmingham, Mich., both privately owned and city-owned trees, have been lost due to Dutch elm disease. Other midwestern cities that have not pursued such a vigorous program to control Dutch elm disease have lost most of their elm trees. For example, at one time the city of Toledo, Ohio, had some 35,000 elms, and today there are few, if any, left. Most of the communities surrounding Birmingham, Mich., have now given up their efforts to control Dutch elm disease.[3]

After purchasing his home in 1970, petitioner undertook a regular maintenance program to care for his trees and shrubbery. He retained the services of a Mr. Brown who had been

---

[3]Petitioner objects to the Court's considering the history of Dutch elm disease in other cities and other communities and asks the Court to focus on just his one elm tree in his neighborhood (not even the entire city of Birmingham, Mich.). That narrow focus is totally unrealistic. The Court is asked to shut its eyes to the facts in the record in regard to the prevalence of this disease in a 42-State area.

caring for those grounds for many years. Mr. Brown fertilized and sprayed the elm tree with Methoxychlor several times a year. Petitioner, himself, fertilized the elm tree and periodically inspected it for visual signs of Dutch elm disease. Mr. Brown sprayed the tree one last time in June 1976 and then retired from his work as a grounds keeper. Petitioner hired a company that injected his elm tree with the fungicide Lignasan in July 1976.[4] Thereafter, petitioner retained a Mr. Jasso to care for his grounds. In the fall of 1976, Mr. Jasso fertilized the trees and inspected them, finding no symptoms of Dutch elm disease in the elm tree. On May 11, 1977, Mr. Jasso sprayed petitioner's elm tree with Methoxychlor for the first time since Mr. Brown had sprayed it in June of 1976. On June 16, 1977, Mr. Jasso again sprayed the elm with Methoxychlor. On neither occasion did he see any visible signs of Dutch elm disease. However, Mr. Jasso does not know whether or not the tree was infected with Dutch elm disease on the occasion of either spraying. Toward the end of June 1977, petitioner went out of town on business, and when he returned, shortly after the Fourth of July, he found that his elm tree had been "red tagged" by the city of Birmingham. On July 5, 1977, an inspection crew for the city of Birmingham Department of Parks and Recreation, conducting one of the Dutch elm disease surveys on petitioner's street, noted "flagging" over two-thirds of the crown of petitioner's elm tree. A sample was removed for laboratory analysis.

Before the report was received back from the laboratory, petitioner contacted a forester at the Department of Parks and Recreation to discuss whether or not the tree could be saved. Petitioner regards this telephonic contact as a request for a permit to try to treat the tree. There is no indication that this individual was authorized to grant or deny such a request. In any event, the city of Birmingham Department of Parks and Recreation required written approval for a homeowner to defer removing a diseased tree and to attempt to treat the tree. On

[4] Petitioner testified that he read an article in a magazine on a plane that suggested this was a prudent idea. However, there is no evidence as to the effect, if any, of injecting Lignasan into a healthy elm tree. The city of Birmingham, Mich., warns homeowners not to inject a healthy elm tree with Lignasan or other fungicides. Petitioner, of course, argues that his tree was healthy at that time, and all the facts indicate that the tree did appear to be healthy at that time. If the tree contained any Dutch elm disease fungus at that time, it may well be that the Lignasan was therapeutic and perhaps helped curtail the spread of the disease.

July 15, 1977, the laboratory results became available and indicated that petitioner's tree had Dutch elm disease. Under the city ordinance, the tree had to be removed within 10 days, unless the homeowner obtained written permission to try to treat the tree. Petitioner neither sought nor obtained such written approval after the laboratory report confirmed the presence of Dutch elm disease.

On August 5, 1977, petitioner had Mr. Jasso remove the diseased elm tree and stump at a cost of $380. Petitioner made a claim against his insurance company for the loss, but the company denied that such loss was covered. Considering the care he had given his trees and shrubbery over the years, petitioner was astonished that his tree had contracted Dutch elm disease, and he felt that "There was just no way that should have happened, period." Petitioner's next door neighbor also had an elm tree in his front yard, located about 50 feet from petitioner's elm, and the top of which actually touched the top of petitioner's elm tree. Petitioner's elm was the only elm tree on his block that contracted Dutch elm disease in 1977 or up to the time of the trial of this case.[5]

On his Federal income tax return for 1977, petitioner claimed a casualty loss for his elm tree in the amount of $2,640 less the $100 statutory limitation.[6] Respondent disallowed the casualty loss deduction in the statutory notice.

## OPINION

The issue here is whether the loss of petitioner's elm tree from Dutch elm disease qualifies as a casualty loss under section 165(c)(3). That provision permits an individual to deduct losses of

---

[5]Petitioner asks the Court to find that his elm tree was the only such loss from Dutch elm disease in the entire neighborhood or subdivision. Petitioner bases the requested finding on his testimony that he regularly walked his dog in the neighborhood and that he had never observed any Dutch elm disease or "flagging" on trees. Given the fact that Dutch elm disease can only be confirmed by laboratory analysis, the Court would accord little weight to the testimony of a layman. The Court is not persuaded that petitioner, despite his technical education and training, has any particular knowledge or expertise in spotting Dutch elm disease. Moreover, the Court is not persuaded that petitioner's regular dog-walking excursions were in fact the careful tree inspections that he now considers them to have been.

[6]If petitioner sustained a deductible casualty loss, the record shows the amount of his loss to be at least the amount claimed on the tax return.

nonbusiness property arising from "fire, storm, shipwreck, or other casualty."[7] The term "other casualty" is not defined in the statute or in the legislative history of the provision. However, the courts, applying the rule of ejusdem generis, have held that the term "other casualty" means something similar to a fire, storm, or shipwreck in requiring a sudden, unusual, unexpected, and accidental force or agency to be applied against the property. The term is usually defined to mean "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." *Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941). That definition has been held to exclude losses arising from such things as termites, dry rot, and rust, with the exception of the so-called "fast termite" cases which will be cited below. *Hoppe v. Commissioner*, 42 T.C. 820, 823 (1964), affd. 354 F.2d 988 (9th Cir. 1965). In any event, it is clear that the casualty loss provision is not "designed to take care of *all* losses that the economic world may bestow on its inhabitants." *Billman v. Commissioner*, 73 T.C. 139, 141 (1979).

To bring himself within the ambit of the "fast termite" cases and two other cases involving southern pine beetles, petitioner treats this case as one involving a "sudden attack of insects" or "the sudden invasion and onslaught of the European elm bark beetles." However, in those cases, it was the termites or the southern pine beetles that inflicted damage.[8] Here, there is no suggestion that the beetles, themselves, inflicted any damage on petitioner's tree. The tree was infected with Dutch elm disease and therefore had to be removed under the provisions of local

---

[7]SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \* \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

[8]*Termites*: see *Rosenberg v. Commissioner*, 198 F.2d 46 (8th Cir. 1952); *Buist v. United States*, 164 F. Supp. 218 (E.D. S.C. 1958); *Shopmaker v. United States*, 119 F. Supp. 705 (E.D. Mo. 1953); *Kilroe v. Commissioner*, 32 T.C. 1304 (1959). *Southern pine beetles*: see *Black v. Commissioner*, T.C. Memo. 1977–337; *Nelson v. Commissioner*, T.C. Memo 1968–35.

municipal ordinances. The role of the beetle was that of the probable carrier of the fungus causing Dutch elm disease.

Petitioner assumes that the Dutch elm disease fungus was transmitted to his elm tree by beetles rather than by root grafts, and that does seem to be the more likely method. The next door neighbor's elm tree was located within 50 feet of petitioner's elm, with the tops of the two trees touching and their branches actually "intermingling" as petitioner described it. Since the neighbor's elm did not and has not up to this time contracted Dutch elm disease, it is unlikely that petitioner's tree became infected by way of root grafts from the neighbor's tree.

However, assuming the disease was transmitted to petitioner's tree by beetles, it does not follow that there was a sudden attack or invasion by the beetles. There is simply no evidence of this supposed invasion or attack of beetles. The record does not disclose any evidence of "emergence holes" or any other evidence of the presence of beetles except the fact that petitioner's tree became infected with Dutch elm disease. Petitioner is really arguing that since his tree became infected with Dutch elm disease and since the fungus causing Dutch elm disease was most likely transmitted by beetles, then there must have been a sudden attack or invasion of those beetles. We think it requires a willing suspension of disbelief to accept the view that beetles suddenly and selectively attacked or invaded petitioner's tree but did not attack the next door neighbor's tree, the branches of which actually intermingled with those of petitioner's tree.

The record does not, and with the present state of knowledge perhaps cannot, show when, where, or how the fungus entered petitioner's tree. The analogy to cancer, as drawn by petitioner's expert witness, is particularly apt in describing the silent way the Dutch elm disease fungus can infect an elm tree and spread throughout the tree before any external signs are manifested. What we have in this case is a loss caused by a disease, not by an attack of insects.

We must decide whether a loss occasioned by disease constitutes a deductible casualty loss. To date, no court, including this one, has allowed a casualty loss deduction for losses resulting

from diseases. See *Campbell v. Commissioner*, 504 F.2d 1158 (6th Cir. 1974), affg. a Memorandum Opinion of this Court[9] (laminitis afflicting a horse); *United States v. Flynn*, 481 F.2d 11, 13 (1st Cir. 1973) (horse disease); *Appleman v. United States*, 338 F.2d 729 (7th Cir. 1964) (phloem necrosis afflicting elm tree); *Burns v. United States*, 284 F.2d 436 (6th Cir. 1960), affg. per curiam 174 F. Supp. 203 (N.D. Ohio 1959) (Dutch elm disease); *Maher v. Commissioner*, 76 T.C. 593 (1981) (lethal yellowing afflicting palm trees).[10] In fact, the Sixth Circuit, to which any appeal in this case would lie, has taken the position that loss occasioned by disease, however contracted, is never a casualty loss.[11]

The Sixth Circuit's position is based on the well-reasoned opinion of the District Court in *Burns v. United States*, 174 F. Supp. 203 (N.D. Ohion 1959), affd. per curiam 284 F.2d 436 (6th Cir. 1960). In *Burns*, as in this case, an elm tree that became infected with Dutch elm disease was removed pursuant to a municipal ordinance. In disallowing the taxpayers' claim to a casualty loss deduction, the District Court stated (174 F. Supp. at 210):

> Taxpayers have cited no case where a deduction as a casualty loss has ever been allowed for plant life afflicted with disease. The nearest approach is the [termite] cases.[12]
>
> In those cases, the damage was inflicted by the termites themselves. In the case at bar, the beetles inflicted little or no damage, but acted merely as a carrier of a disease with which the tree became infected. The carrying of disease germs is not peculiar to insects. Disease germs are carried in a variety of ways, even by human beings and by the air which we breathe.

---

[9]*Campbell v. Commissioner*, T.C. Memo 1973–101.

[10]See also *Daugette v. Commissioner*, T.C. Memo. 1977–56 (colic afflicting a horse); *McMorran v. Commissioner*, B.T.A. Memo. 1939–117 (influenza afflicting a horse). Cf. *Kemper v. Commissioner*, 30 T.C. 546 (1958), affd. 269 F.2d 184 (8th Cir. 1959) (some evidence indicating existence of phloem necrosis). The one possible exception is *Black v. Commissioner*, T.C. Memo. 1977–337. In *Black*, this Court allowed the taxpayers a casualty loss deduction for the destruction of their pine trees caused by an attack of southern pine beetles. The Court in *Black* suggested that it did not matter whether the trees' destruction was caused by the swarming attack of the beetles or fungi carried by the beetles. However, the Court noted that the accepted view of the authorities was that it was the beetles that killed the trees. The Court in *Black* made no finding that disease caused the trees' death, and we do not consider that case as holding that disease can be a casualty.

[11]Under the *Golsen* rule, this Court follows the law of the circuit to which the appeal would lie. *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

[12]The termite cases referred to are *Rosenberg v. Commissioner, supra; Buist v. United States, supra; Shopmaker v. United States, supra*.

There is nothing sudden, unusual or unexpected for a beetle (or any other insect) to feed on a tree, or to deposit its eggs underneath the bark in the tree lining or to act as a carrier of disease or for the tree to become infected with disease and die in consequence thereof. These are everyday occurrences of nature.

While it is true that the tree was removed within a relatively short period of time, the reason for its removal was the disease which would have ultimately caused its death. The action of the disease is a progressive one. The reason for removing the tree before this progressive force ran its natural course was to prevent the spread of the disease to other trees in the area.

To allow recovery here would necessitate an extension of the doctrine of [the termite cases]. The result would be to open wide the door to all sorts of claims for casualty deduction on account of loss or damage to plant life or animals caused by any kind of disease. [The termite cases] do not have a sufficiently firm foundation to warrant their extension.

In common parlance, death resulting from disease is not regarded as an accident. The onset of the disease, whether the illness was of short duration or lingering, and the time of discovery might all have importance in determining whether it was a casualty.

In my judgment, loss occasioned by disease, however contracted, is not a casualty within the meaning of the statute.

On two subsequent occasions, the Sixth Circuit has praised, and reiterated its approval of, the District Court's opinion in *Burns*. See *Campbell v. Commissioner, supra; Meersman v. United States*, 370 F.2d 109 (6th Cir. 1966).

We agree with the views espoused in the *Burns* opinion and adopt its approach. It is not only a logical and well-reasoned approach, but it is also administratively feasible to implement. Most importantly, however, it is consistent with this area of the law as it has developed. A disease simply does not exhibit the same qualitative characteristics as the other events that have served to define the scope of section 165(c)(3).[13] To begin

---

[13]Attaching significance to the qualitative differences between accidents and diseases is not limited to tax law. See R. Keeton, Basic Text on Insurance Law, sec. 5.4, p. 289 (1971), wherein the author states:

"For example, even apart from more restrictive phrases sometimes incorporated in life and personal accident policies, the terms 'accidental death' and 'accidental bodily injury' themselves express an intention to narrow coverage to something far short of all fortuitous harms to the insured. Disease and bodily deterioration, for example, are not within the risks covered by such contract provisions, even though they produce losses that are fortuitous and as to which there is no public policy against insurance coverage."

The destruction to petitioner's tree may be viewed in much the same way. For example, if the tree had been destroyed by a hurricane, this would have constituted an "unexpected, accidental force." *White v. Commissioner*, 48 T.C. 430, 435 (1967); see also *Cary v. Commissioner*, a Memorandum Opinion of this Court dated Oct. 6, 1948. However, the destruction of the tree by disease represents a bodily deterioration, i.e., "the progressive deterioration of property through a steadily operating cause." *Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941).

differentiating "fast" diseases from "slow" diseases, or to categorize the invasion of a disease-causing organism as a "sudden invasion by a hostile agency" (*Fay v. Helvering, supra* ) would extend section 165(c)(3) well beyond a commonsense application of the principle of ejusdem generis.

In the present case, petitioner, too, agrees that the Court should not direct its inquiry to whether "one fungus may work quickly, while another fungus may work slowly."[14] Petitioner's argument, of course, was directed to the sudden attack or onslaught of beetles, an event not established by the record. Petitioner, also, no doubt wished to avoid the Sixth Circuit's ruling that disease does not constitute a casualty. We conclude that a loss caused by disease, whether the disease-causing organism infects the host suddenly or over a period of time or whether the disease manifests itself suddenly or over a period of time, represents "the progressive deterioration of property through a steadily operating cause" (*Fay v. Helvering, supra* ) and does not constitute a casualty loss. The facts in this case are indistinguishable from those in the *Burns* case, *supra*, which we will follow. Accordingly, petitioner's claimed casualty loss is disallowed.

Because of the concession in regard to another casualty loss involving an automobile, a computation under Rule 155 will be necessary.

*Decision will be entered under Rule 155.*

---

[14]If that were the inquiry rather than the inquiry's being about the sudden attack of insects, then petitioner would make essentially the same argument about "suddenness" that the taxpayers make in *Maher v. Commissioner*, 76 T.C. 593 (1981), issued this day. We agree with the Court's holding in *Maher* that suddenness refers to the suddenness of the loss rather than the suddenness of the precipitating event. We need not address the "suddenness" issue. In this case, unlike the situation with lethal yellowing, there is no indication of any particular precipitating event, no indication that once the fungus is injected into the tree that the disease necessarily develops or that the disease, if it develops, is necessarily fatal to the tree.