JOHN A. MAHER AND MADELINE K. MAHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4271–78.     Filed April 8, 1981.

---

*Kurt Wellisch,* for the petitioner.
*Jan S. Neiman,* for the respondent.

HALL, *Judge:* Respondent determined a $14,669 deficiency in petitioners' 1974 income tax. The issue for decision is whether the destruction of 22 palm trees caused by a disease known as "lethal yellowing" qualifies as a casualty loss deduction under section 165(c)(3).[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners John A. and Madeline K. Maher, husband and wife, resided in Miami Beach, Fla., when they filed their petition in this case.

In May 1974, petitioners purchased a residence at 5589 Pine Tree Drive, Miami Beach, Fla. The property contained 22 fully matured coconut palms. All 22 trees died in or around September 1974 from a disease commonly referred to as "lethal yellowing." As a result of the death of these trees, petitioners sustained an $8,000 loss.

Lethal yellowing is a disease that affects coconut palms. It is caused by a mycoplasma-like organism which infiltrates the food-conducting veins of the tree. The organism is carried from palm to palm by a leaf hopper insect called myndus crudus. The myndus crudus feeds upon the coconut palm's food-conducting veins and it is during this feeding that the tree's veins are exposed to the organism.[2]

The period between the date when a coconut palm is first infected with the organism and the date the symptoms of the disease first become apparent is called the "incubation period."

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

[2] The record does not indicate how the myndus crudus obtains the mycoplasma-like organism that causes lethal yellowing, nor does the record reveal whether all such insects carry the organism.

The incubation period ranges from 4 to 12 months, with the average period being 5 to 6 months. During the incubation period, the disease is undetectable. The period between the date the symptoms first become apparent and the date of death is called the "apparent disease period." The apparent disease period ranges from 1 to 6 months, with the average period being 4 months.

The apparent disease period begins with the dropping of the immature coconuts. This is followed by a yellowing of the lower fronds and a darkening of the young flowers of the tree. The yellowing then spreads upward from the lower fronds through the crown of the tree, eventually encompassing the entire crown. In time, the bud growth at the top of the palm dies, and eventually the entire top of the tree falls off.

When petitioners' palms died in 1974, there was no known treatment for lethal yellowing, nor were there any precautionary measures available to protect a palm from the disease. Once infected, a tree was sure to die.[3]

Lethal yellowing first appeared in the United States in Key West, Fla., in 1955. The disease moved 100 miles north to Key Largo in 1969. Mainland Florida reported the first case of lethal yellowing in October 1971, when it struck the Coral Gables area. In September 1972, the disease continued its march north and appeared for the first time in the Miami Beach area. Prior to the onslaught of lethal yellowing, the coconut palm population in Dade County, Fla. (which encompasses Miami Beach), approximated 225,000. As of December 31, 1972, 1,200 trees had become infected with the disease. One year later that number had risen to 20,000 trees, and 2 years later at least 50 percent of the coconut palm population had contracted the disease.[4]

In his statutory notice, respondent disallowed the entire casualty loss deduction claimed by petitioners with respect to the destruction of their coconut palms.

---

[3]In September 1974, a treatment became available to the general public. To be effective, however, the treatment must be applied before a tree's leaves begin to yellow. Accordingly, the treatment is used primarily on a preventative basis.

The record does not indicate whether petitioners' trees died prior to, or subsequent to, the discovery of the treatment. But even if petitioners' trees were still alive when the treatment was first introduced, the disease would have progressed too far to prevent their death.

[4]During this period, the media in the Miami area carried stories concerning the symptoms and effects of lethal yellowing.

OPINION

The issue for decision is whether petitioners sustained a deductible casualty loss. Petitioners contend that they are entitled to a casualty loss deduction under section 165(c)(3) on account of the destruction of their coconut palms by lethal yellowing. On the other hand, respondent asserts that petitioners' loss does not fall within the ambit of "other casualty" as used in section 165(c)(3). For the reasons stated below, we agree with respondent.

Section 165(c)(3)[5] speaks of losses arising from "fire, storm, shipwreck, or other casualty." The term "other casualty" is not defined in the Internal Revenue Code nor does the legislative history provide any guidance to its meaning.[6] Consequently, the parameters of the term have evolved judicially.

Although the term "other casualty" if taken by itself might be susceptible to a broad interpretation, courts have delimited its scope by applying the doctrine of ejusdem generis.[7] Thus the term "other casualty" has been interpreted to mean "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." *Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941). Simply stated, it connotes a loss proximately caused by a sudden, unexpected, or unusual event. See, e.g., *Matheson v. Commissioner*, 54 F.2d 537, 539 (2d Cir. 1931); *Farber v. Commissioner*, 57 T.C. 714, 718 (1972). These limitations comport with the notion that the Internal Revenue Code is not "designed to take care of *all* losses that the economic world may bestow on

---

[5]SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

[6]For a road map of the legislative history of sec. 165(c)(3), see Note, "The Casualty Loss Deduction and Consumer Expectation: Section 165(c)(3) of the Internal Revenue Code," 36 U. Chi. L. Rev. 220 (1968).

[7]Ejusdem generis is defined as "of the same kind, class or nature." Black's Law Dictionary 608 (4th ed. 1968). The application of ejusdem generis in sec. 165(c)(3) has not been without its critics. See S. Golding, "The Scope of 'Other Casualty': A Rejection of the Rule of Ejusdem Generis," 51 Taxes 525 (1973).

its inhabitants." *Billman v. Commissioner*, 73 T.C. 139, 141 (1979).

At the threshold, we must decide whether a loss occasioned by disease constitutes a deductible casualty loss. To date, no court, including this one, has allowed a casualty loss deduction for losses resulting from diseases. See *Campbell v. Commissioner*, 504 F.2d 1158 (6th Cir. 1974), affg. a Memorandum Opinion of this Court [8] (laminitis afflicting a horse); *United States v. Flynn*, 481 F.2d 11, 13 (1st Cir. 1973) (horse disease); *Appleman v. United States*, 338 F.2d 729 (7th Cir. 1964) (phloem necrosis afflicting a tree); *Burns v. United States*, 284 F.2d 436 (6th Cir. 1960), affg. per curiam 174 F. Supp. 203 (N.D. Ohio 1959) (Dutch elm disease); *Coleman v. Commissioner*, 76 T.C. 580 (1981) (Dutch elm disease).[9] However, only the Sixth Circuit has taken the position that a disease may never translate into a casualty loss.

The Sixth Circuit's position is based on the well-reasoned District Court opinion in *Burns v. United States*, 174 F. Supp. 203 (N.D. Ohio 1959), affd. per curiam 284 F.2d 436 (6th Cir. 1960). In *Burns*, an elm tree that became infected with Dutch elm disease was removed pursuant to a municipal ordinance. In disallowing the taxpayer-owners' claim to a casualty loss deduction, the District Court stated:

Taxpayers have cited no case where a deduction as a casualty loss has ever been allowed for plant life afflicted with disease. The nearest approach is the [termite] cases.[10]

In those cases, the damage was inflicted by the termites themselves. In the case at bar, the beetles inflicted little or no damage, but acted merely as a

---

[8]*Campbell v. Commissioner*, T.C. Memo. 1973–101.

[9]See also *Daugette v. Commissioner*, T.C. Memo. 1977–56 (colic afflicting a horse); *McMorran v. Commissioner*, a Memorandum Opinion of this Court dated Mar. 20, 1939 (influenza afflicting a horse). Cf. *Kemper v. Commissioner*, 30 T.C. 546 (1958), affd. 269 F.2d 184 (8th Cir. 1959) (some evidence indicating existence of phloem necrosis). The one possible aberration is *Black v. Commissioner*, T.C. Memo. 1977–337. In *Black*, this Court allowed the taxpayers a casualty loss deduction for the destruction of their pine trees caused by an attack of southern pine beetles. The Court in *Black* suggested that it did not matter whether the trees' destruction was caused by the swarming attack of the beetles or fungi carried by the beetles. However, the Court noted that the accepted view of the authorities was that it was the beetles that killed the trees. The Court, in *Black*, made no finding that disease caused the trees' death, and we do not consider that case as holding that disease can be a casualty.

[10]The termite cases referred to are *Rosenberg v. Commissioner*, 198 F.2d 46 (8th Cir. 1952); *Buist v. United States*, 164 F. Supp. 218 (E.D. S.C. 1958); *Shopmaker v. United States*, 119 F. Supp. 705 (E.D. Mo. 1953).

carrier of a disease with which the tree became infected. The carrying of disease germs is not peculiar to insects. Disease germs are carried in a variety of ways, even by human beings and by the air which we breathe.

There is nothing sudden, unusual or unexpected for a beetle (or any other insect) to feed on a tree, or to deposit its eggs underneath the bark in the tree lining or to act as a carrier of disease or for the tree to become infected with disease and die in consequence thereof. These are everyday occurrences of nature.

While it is true that the tree was removed within a relatively short period of time, the reason for its removal was the disease which would have ultimately caused its death. The action of the disease is a progressive one. The reason for removing the tree before this progressive force ran its natural course was to prevent the spread of the disease to other trees in the area.

To allow recovery here would necessitate an extension of the doctrine of [the termite cases]. The result would be to open wide the door to all sorts of claims for casualty deduction on account of loss or damage to plant life or animals caused by any kind of disease. [The termite cases] do not have a sufficiently firm foundation to warrant their extension.

In common parlance, death resulting from disease is not regarded as an accident. The onset of the disease, whether the illness was of short duration or lingering, and the time of discovery might all have importance in determining whether it was a casualty.

In my judgment, loss occasioned by disease, however contracted, is not a casualty within the meaning of the statute.

[174 F. Supp. at 210.]

On two subsequent occasions, the Sixth Circuit has praised, and reiterated its approval of, the District Court's opinion in *Burns*. See *Campbell v. Commissioner*, 504 F.2d 1158 (6th Cir. 1974); *Meersman v. United States*, 370 F.2d 109 (6th Cir. 1966).

We agree with the views espoused in the *Burns* opinion and adopt its approach. It is not only a logical and well-reasoned approach, but it is also administratively feasible to implement. Most importantly, however, it is consistent with this area of the law as it has developed. A disease simply does not exhibit the same qualitative characteristics as the other events that have served to define the scope of section 165(c)(3).[11] To begin

---

[11]Attaching significance to the qualitative differences between accidents and diseases is not limited to tax law. See R. Keeton, Insurance Law, sec. 5.4 (1971), wherein the author states:

"For example, even apart from more restrictive phrases sometimes incorporated in life and personal accident policies, the terms "accidental death" and "accidental bodily injury" themselves express an intention to narrow coverage to something far short of all fortuitous harms to the insured. Disease and bodily deterioration, for example, are not within the risks covered by such contract provisions, even though they produce losses that are fortuitous and as to which there is no public policy against insurance coverage."

R. Keeton, *supra* at 289. The destruction to petitioners' trees may be viewed in much the same

differentiating "fast" diseases from "slow" diseases, or to categorize the invasion of a disease-causing organism as a "sudden invasion by a hostile agency" (*Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941)), would extend section 165(c)(3) well beyond a commonsense application of the principle of ejusdem generis.

As applied to our facts, petitioners' coconut palms were destroyed by a disease known as lethal yellowing. This disease is transmitted by an insect, the myndus crudus, while it feeds on a coconut palm. There is no evidence that the insect itself causes any damage to the tree. These facts are indistinguishable from those in *Burns v. United States, supra,* and, accordingly, petitioners' claimed loss is disallowed.

In support of their deduction, petitioners focus on the concept of "suddenness" which has emerged as the primary attribute of deductible casualty losses. See, e.g., *Hoppe v. Commissioner*, 42 T.C. 820, 823 (1964), affd. 354 F.2d 988 (9th Cir. 1965); *Kilroe v. Commissioner*, 32 T.C. 1304, 1306–1307 (1959).[12] According to petitioners, the key factor in determining "suddenness" is the precipitating event, not the length of time it takes for the damage to manifest itself. In this case, petitioners argue that the depositing of the mycoplasma-like organism into the tree's veins by the myndus crudus constitutes the necessary sudden event. From that moment the tree was doomed because no cure existed in 1974. We disagree with petitioners' analysis. As previously mentioned, we do not believe a disease is the type of casualty envisioned in section 165(c)(3). But even if we were not to endorse such a blanket rule, petitioners would still not prevail.

Although there is some support for petitioners' view that the suddenness requirement refers to the suddenness of the precipitating event (see *Shopmaker v. United States*, 119 F. Supp. 705 (E.D. Mo. 1953) (invasion of termites)),[13] we believe the better

---

way. For example, if the trees had been destroyed by a hurricane, this would have constituted an "unexpected, accidental force." *White v. Commissioner*, 48 T.C. 430, 435 (1967); see also *Cary v. Commissioner*, T.C. Memo. 1948–202. However, the destruction of the trees by disease represents a bodily deterioration, i.e., "the progressive deterioration of property through a steadily operating cause." *Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941).

[12]See also *Rowley v. Commissioner*, T.C. Memo. 1979–338; *Nelson v. Commissioner*, T.C. Memo. 1968–35.

[13]See also *Burkett v. Commissioner*, T.C. Memo. 1951–290 (damage caused by hurricane gradually manifested itself during the 2-year period following the precipitating event).

and more prevalent view is to measure the suddenness of the loss itself, i.e., the lapse of time between the precipitating event and the loss proximately caused by that event. See, e.g., *Hoppe v. Commissioner*, 42 T.C. 820, 823–824 (1964); *Dodge v. Commissioner*, 25 T.C. 1022, 1026 (1956).[14] The testimony of the two expert witnesses called in this case establishes that it takes anywhere from 6 to 18 months for lethal yellowing to run its course.[15] Petitioners introduced no evidence at trial indicating which end of this time spectrum their trees experienced. But even assuming their trees were exposed to the average time span of 9 to 10 months, this is not sufficiently sudden.[16] In our view, a disease spanning a 9- to 10-month time frame (not to mention the possibility of 18 months) constitutes a lingering, gradual deterioration. See *Fay v. Helvering*, 120 F.2d 253 (2d Cir. 1941).[17] This is in contradistinction to the relatively swift consequences accompanying the onslaught of southern pine beetles on pine trees. See *Black v. Commissioner*, T.C. Memo. 1977–337 (30 days); *Nelson v. Commissioner*, T.C. Memo. 1968–35 (5 to 10 days).

---

[14]See also *Rowley v. Commissioner*, T.C. Memo. 1979–338; *Miller v. Commissioner*, T.C. Memo. 1970–167.

[15]This time frame represents the combination of the incubation period and the apparent disease period. See p. 595 *supra*.

[16]We recognize that in certain "fast" termite cases a longer period of time has been viewed as sudden. See *Hoppe v. Commissioner*, 42 T.C. 820, 824 n. 3 (1964). We do not find those cases to be controlling. First, we note that the term "suddenness" is comparative and each case must turn on its own facts. See *Hoppe v. Commissioner*, 42 T.C. 820, 823 (1964); *Kilroe v. Commissioner*, 32 T.C. 1304, 1306 (1959). Second, the "fast" termite cases are viewed as exceptional cases (see *Hoppe v. Commissioner*, *supra* at 823 (1964); *Austra v. Commissioner*, T.C. Memo. 1966–28), and we decline to expand the scope of those cases. Third, we have found only two "fast" termite cases decided by this Court, and, in each of those, the period of time involved was less than 9 or 10 months. See *Kilroe v. Commissioner*, *supra* (3 months); *Cate v. Commissioner*, T.C. Memo. 1962–214 (6 months). Fourth, none of the "fast" termite cases, regardless of forum, have entailed a period as long as 18 months, which is the period conceivably applicable in the instant case. See *Hoppe v. Commissioner*, *supra* at 824 n. 3; *Denton v. Bingler*, an unreported case (W.D. Pa. 1963, 12 AFTR 2d 5732, 63–2 USTC par. 9731) (5 months).

[17]We note in passing that the combination of (1) the migratory pattern of lethal yellowing from Key West in the 1950's to Key Largo in 1969 to the Florida mainland in 1971, (2) the epidemic outbreak of the disease in the Miami Beach area in 1972 through 1974, and (3) the publicity accompanying this outbreak, makes it difficult to categorize the disease as unusual or unexpected. See *Appleman v. United States*, 338 F.2d 729 (7th Cir. 1964). However, the existence of other grounds for disallowing petitioners' claimed deduction obviates the need to consider whether the deduction would fail on this basis alone.

To reflect the foregoing,

*Decision will be entered for the respondent.*