T.C. Memo. 2013-40

UNITED STATES TAX COURT

DENISE CELESTE MCMILLAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4590-11.                                    Filed February 7, 2013.

R determined deficiencies in P's 2007 and 2008 Federal income tax. P and R dispute whether P is entitled to deduct expenses in excess of the gross income from her horse activity, whether the death of P's stallion was a casualty loss, and whether P is entitled to deduct legal and professional expenses.

<u>Held</u>: P is not entitled to deductions for the expenses incurred in her horse activity for the 2007 and 2008 tax years.

<u>Held</u> <u>further</u>, the death of P's stallion was not a casualty loss in the 2008 tax year.

<u>Held</u> <u>further</u>, P is not entitled to deduct the disputed legal and professional expenses for the 2007 and 2008 tax years.

<u>Held</u> <u>further</u>, P is not liable for the I.R.C. sec. 6662(a) accuracy-related penalties for the 2007 and 2008 tax years.

[*2]   Denise Celeste McMillan, pro se.

Priscilla Parrett, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WHERRY, Judge: This case is before the Court on a petition for redetermination of Federal income tax deficiencies that respondent determined for petitioner's 2007 and 2008 tax years of $10,107 and $1,560, respectively, and section 6662(a) accuracy-related penalties for 2007 and 2008 of $2,021.40 and $312, respectively.[1]

Respondent concedes that petitioner has substantiated all of her claimed expenses for the years at issue. The issues for decision are:

1) whether petitioner is entitled to deductions arising from her horse activity[2] claimed on her Schedules C, Profit or Loss From Business, to the extent

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 (Code), as amended and in effect for the taxable years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]On brief petitioner criticizes respondent's use of "activity" or "horse activity". In cases with sec. 183 issues "horse activity" is a term of art and this Court generally uses it to discuss the issues because whether activities amount to a business "engaged in for profit" is a legal conclusion for the Court to determine. Therefore we refer to petitioner's horse activity as an activity until we render a

(continued...)

[*3] they exceed her gross income from that activity for the 2007 and 2008 tax years. More specifically, whether petitioner was engaged in her horse activity for profit;

2) whether petitioner is entitled to a Schedule C interest expense deduction for the 2008 tax year;

3) whether the death of the stallion Goldrush I was a casualty loss for the 2008 tax year;[3]

4) whether petitioner is entitled to claim deductions on Schedule C for legal and professional expenses for the 2007 and 2008 tax years; and

5) whether petitioner is liable for section 6662(a) accuracy-related penalties for the 2007 and 2008 tax years.

FINDINGS OF FACT

While the parties did not file a stipulation of facts, at trial they introduced a number of exhibits, and those exhibits are hereby incorporated by reference into

---

[2](...continued)
conclusion regarding the sec. 183 issue.

[3]The parties agree that if the Court determines that petitioner is entitled to this expense deduction, it should be claimed for the 2008 tax year, because Goldrush died in 2008.

[*4] our findings.[4]  Petitioner was single and filed  Forms 1040, U.S. Individual Income Tax Return, for the taxable years at issue.  Petitioner resided in California when she filed her petition.

During the years at issue petitioner worked full time for Tony Hoffman Productions, Inc., out of her home in California.  During the 2007 and 2008 tax years she earned $60,630 and $60,000, respectively, from that job.

Petitioner has an affinity for horses.  She began riding ponies when she was four years old and began taking formal riding lessons when she was nine.  Petitioner is an accomplished horsewoman earning, among other trophies, a number of plaques from the California Dressage Society from 1989 through 1999.

---

[4]Respondent, inter alia, objects to Exhibits 22-P through 30-P, 32-P through 35-P, 37-P through 48P, and 51-P through 62-P on the grounds of relevance. Fed. R. Evid. 401 states:  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  We  overrule respondent's objections and hold that the exhibits tend to describe petitioner's horse activity as well as the reasonableness of her underpayment.

Petitioner filed a motion on August 30, 2012, to reopen the record to introduce additional evidence.  Because introduction of new evidence after the case was submitted would prejudice respondent and the additional evidence would not have had a substantial effect on petitioner's case, we will deny the motion.  See Butler v. Commissioner, 114 T.C. 276, 286-287 (2000).  The Court notes that respondent conceded that petitioner substantiated all of her expenses and the additional information would have additionally substantiated those expenses.  The Court also notes that this evidence was always available and petitioner could and should, if she wanted it to be considered, have introduced it at trial.

[*5] During the years at issue petitioner was a member of the following organizations: California Dressage Society, United States Dressage Federation, United States Equestrian Foundation, and the United States Equestrian Team.

Petitioner began a dressage horse breeding, showing, competing, and training activity in the mid-1970s. Petitioner would also take difficult horses on consignment, retrain them, and sell them at a profit. She generally had between one and six horses. However, beginning in 1998 petitioner owned only one horse.

On February 28, 1992, petitioner's business partner at that time, Tom Valter, wrote a check for $25,000. At trial petitioner explained that the check was written as partial payment of the purchase price for Goldrush I (Goldrush). Petitioner boarded Goldrush from 1992 through 2007 at Baronsgate Equestrian Center, the name of which was changed to Lion's Heart Ranch in 2004. Between 1992 and 1998 Goldrush sired five foals and his stud fee was $1,000 to $1,500. In 1999 petitioner testified against her former business partner in an animal abuse case and after that "no one would breed to Goldrush". After 1999 Goldrush did not sire any more foals.

From 1992 through 1999 petitioner entered Goldrush in dressage competitions. Then in 1999 Goldrush suffered from a minor lameness that "was enough to get him eliminated from dressage competition immediately by any

[*6] judge". Petitioner then tried "everything" to heal Goldrush. She tried to train him through it, took him to trainers and veterinarians, fed him supplements and medications, and even tried custom saddles and shoes. Nothing worked.

From 1999 through 2008 petitioner did not compete in any dressage competitions. She was also not paid to train any horses for dressage competitions during that time, nor did she take any other horses on consignment.

In 2007 petitioner decided to transport Goldrush to Australia to stand at stud. She believed that because of his exceptional blood lines he would be "the proverbial big frog in a small pond in Australia". She planned on setting Goldrush's stud fee at $1,500 per mare and explained, at trial, that Goldrush would not have to compete anymore. Petitioner spent over $16,000 to transport Goldrush to Australia. After spending time in quarantine both before leaving for Australia and after arriving in Australia, Goldrush was sent to a stud farm.

Sadly, just two months after he arrived on the stud farm, Goldrush was rushed to the veterinarian. He had two blood transfusions and then died from a total collapse of his immune system. After Goldrush died petitioner did not purchase another horse.

On her Schedules C attached to her 2007 and 2008 Forms 1040 petitioner listed HORSE BREEDING/SHOWING as her principal business or profession.

[*7] She reported no income for the two years but claimed losses of $51,697 and $4,203, respectively.

From 2004 through 2008 petitioner reported on her Federal income tax returns the following amounts of salary income, gross income from her horse activity, expenses from her horse activity, net profit or (loss) from her horse activity, and taxable income.

| Year | Salary income | Gross income from horse activity | Expenses from horse activity | Net profit or (loss) from horse activity |
|---|---|---|---|---|
| 2004 | $60,254 | $588 | $36,453 | ($35,865) |
| 2005 | 59,336 | -0- | 22,277 | (22,277) |
| 2006 | 60,676 | -0- | 33,128 | (33,128) |
| 2007 | 60,630 | -0- | 51,697 | (51,697) |
| 2008 | 60,000 | -0- | 4,203 | (4,203) |
| Total | 300,896 | 588 | 147,758 | (147,170) |

The Court notes that respondent conceded that petitioner substantiated all of her expenses related to the horse activity but did not concede that she substantiated her expenses related to the casualty loss. Many of petitioner's past returns have been audited, and she has, for prior years, been able to substantiate her expenses and convince respondent that her horse activity was engaged in for profit. The main question before us is not whether petitioner was able to

**[*8]** substantiate the expenses of the horse activity, but whether the horse activity was engaged in for profit in the years at issue.

In 2003 petitioner began to incur legal expenses related to a lawsuit she filed against her homeowners association. According to her complaint, petitioner filed this lawsuit because the homeowners association failed to respond to three of her complaints: 1) "complaints of dogs running wild, dogs barking, and dogs defecating throughout the Association's common areas"; 2) construction defects related to the "presence of mold in her bathroom, growing between the tiles themselves and between the tile wall and the tub rim"; and 3) construction defects leading to excessive "noise intrusion".

## OPINION

### I.    Burden of Proof

The Commissioner's determination of a taxpayer's liability for an income tax deficiency is generally presumed correct, and the taxpayer bears the burden of proving that the determination is improper. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, pursuant to section 7491(a)(1), the burden of proof on factual issues that affect the taxpayer's tax liability may be shifted to the Commissioner where the "taxpayer introduces credible evidence with respect to * * * such issue." The burden will shift only if the taxpayer has, inter alia,

[*9] complied with substantiation requirements pursuant to the Code and "maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".  Sec. 7491(a)(2).

On brief petitioner raises the issue of whether the burden of proof should be shifted to respondent pursuant to section 7491.  Although voluminous, the record is sparsely populated with credible evidence.  Petitioner did not introduce complete credible evidence at trial.  It seems that petitioner believed that she did not have to produce any evidence that respondent did not request.  Petitioner was responsible for providing the evidence needed for her case to be successful, from her prospective, at trial.  She in fact provided only incomplete records at best; therefore the burden of proof remains on her.  See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001).

II.    Petitioner's Horse Activity

Respondent argued that the expenses related to petitioner's horse activity were not deductible in excess of the gross income because the horse activity was not engaged in for profit within the meaning of section 183.  Because petitioner had no gross income from the horse activity during the years at issue, respondent disallowed all of the expenses related to that activity.

[*10] Section 183(a) generally disallows, subject to the exceptions in section 183(b), deductions attributable to activities not engaged in for profit. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The Court of Appeals for the Ninth Circuit, to which this case is appealable absent stipulation to the contrary, has held that an activity is engaged in for profit if the taxpayer's "predominant, primary or principal objective" in engaging in the activity was to realize an economic profit independent of tax savings. Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212. However, if the investor's primary or principal objective is to make a profit, it is not necessary for the investor to show that his primary objective was reasonable. Sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of factors to be considered in evaluating a taxpayer's profit objective: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar

[*11] activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  No one factor is necessarily determinative in the evaluation of profit objective, nor is the number of these factors for or against the taxpayer necessarily determinative.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs.  All facts and circumstances with respect to the activity must be taken into account.  Sec. 1.183-2(b), Income Tax Regs.

A.      The Manner in Which the Taxpayer Carries On the Activity

The fact that the taxpayer carries on the activity in a business like manner may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(1), Income Tax Regs.  In this context we consider:  (1) whether the taxpayer maintained complete and accurate books and records for the activity; (2) whether the taxpayer conducted the activity in a manner substantially similar to comparable activities that were profitable; and (3) whether the taxpayer changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability.  Giles v. Commissioner, T.C. Memo. 2005-28; sec. 1.183-2(b)(1), Income Tax Regs.

[*12] The first inquiry considers whether petitioner maintained complete and accurate books and records of the activity. At trial petitioner stated that she followed recordkeeping procedures that her lawyers and accountants outlined. She also states that she maintained a separate checking account for her horse activity and kept a file for each horse. However, because of petitioner's mistaken belief that she need not present any evidence that respondent did not ask for, she failed to provide documentation to substantiate those statements. Even if petitioner did maintain those records, there is little evidence for the specific taxable years at issue that the books and records were kept for the purpose of "cutting expenses, increasing profits, and evaluating the overall performance of the operation." See Golanty v. Commissioner, 72 T.C. at 430.

Petitioner claims to have written a business plan. But again petitioner did not present it at trial and did not attempt to orally explain her business plan during the trial. A written business plan is not required if the "business plan was evidenced by * * * actions". Phillips v. Commissioner, T.C. Memo. 1997-128. However, in Phillips the taxpayers knew the amounts of income that would be required to cover their expenses in future years. Although petitioner may have had a business plan, there is no evidence that for the years at issue she prepared "profit plans, profit or loss statements, balance sheets, or financial break-even analyses"

**[*13]** for her activity. See Dodge v. Commissioner, T.C. Memo. 1998-89, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999). Petitioner presented no evidence of a budget or that she knew how much she could spend to maintain Goldrush and still make a profit during the years at issue. In just four years, 2004 through 2007, petitioner's horse activity had lost $143,555. Even if Goldrush had not died in 2008, she would have had to breed him 96 times at her higher price of $1,500 per mare just to break even, even though he had sired only five foals in the entire time she had owned him before that. While semen straws might have helped, there had been historically very few of those.

As to the second inquiry, with respect to her horse activity petitioner stated that she had "at all time operated that business in accordance with standard industry practices." But her testimony was not corroborated; documentation of practices in similar activities was not provided, and she did not introduce any other witnesses in the field to discuss or substantiate "standard industry practice".

The third inquiry asks whether petitioner changed operating procedures, adopted new techniques, or abandoned unprofitable methods in a manner consistent with an intent to improve profitability. After years of losses, petitioner did eventually decide to transport Goldrush to Australia. This was certainly a change in operating procedures and after her alleged blackballing by the American

**[\*14]** dressage community, may have been her best hope for garnering interest in Goldrush as a stud.  This does seem to indicate that petitioner at least updated her operating procedure to increase income.  However, petitioner did not elaborate on how this route was expected to improve profitability or, given the cost of moving the activity to Australia, how she projected the profitability of this change.

We conclude that there is simply not enough information in the record to find that petitioner carried on the horse activity in the years at issue in a businesslike manner.  Therefore, this factor favors respondent.

### B.      The Expertise of the Taxpayer or Her Advisers

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * * [Sec. 1.183-2(b)(2), Income Tax Regs.]

We have no doubt that petitioner is an accomplished horsewoman with an extensive background in riding and showing horses.  She has certainly engaged in an extensive study of training, dressage, and horsemanship as evidenced by her dressage clinics and tests.  However, none of the educational materials in the record relate to the economics or business aspects of profitably running a horse activity, and petitioner's background as a lifelong horsewoman is insufficient to indicate expertise in the economics of this business and a profit objective.  See

**[\*15]** <u>Giles v. Commissioner</u>, T.C. Memo. 2006-15 (discounting the probative value of reference materials that do not relate to the business aspects of the horse activity); <u>Giles v. Commissioner</u>, T.C. Memo. 2005-28 (same); <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288.

The main inquiry is whether petitioner received and acted on advice from the experts as to the accepted principles and economics of profitably running a business and not merely the general advice that a horse enthusiast would seek in training and showing horses as a hobby. <u>See</u> <u>Golanty v. Commissioner</u>, 72 T.C. 411 (1979); <u>Chandler v. Commissioner</u>, T.C. Memo. 2010-92, <u>aff'd</u>, 481 Fed. Appx. 400 (9th Cir. 2012); <u>Keating v. Commissioner</u>, T.C. Memo. 2007-309, <u>aff'd</u>, 544 F.3d 900 (8th Cir. 2008); <u>Giles v. Commissioner</u>, T.C. Memo. 2006-15; <u>McKeever v. Commissioner</u>, T.C. Memo. 2000-288 (taxpayers received general advice on showing and promoting horses but not on how to run a profitable horse business). Petitioner did not discuss or otherwise corroborate through evidence such as correspondence or other documentation that she received advice on the specifics of profitably running a horse activity, nor did she present any advisers at trial.

**[*16]** We conclude that petitioner has not established that she sought expert advice regarding the business and economic aspects of carrying on her activity for profit; therefore, this factor weighs in favor of respondent.

    C.    <u>The Time and Effort Expended by the Taxpayer in Carrying on the Activity</u>

> The fact that the taxpayer devotes much of * * * [her] personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote much of * * * [her] energies to the activity may also be evidence that the activity is engaged in for profit. * * * [Sec. 1.183-2(b)(3), Income Tax Regs.]

Petitioner did not discuss how much time per week she spent working on her horse activity. We assume that she did spend a significant amount of time taking care of Goldrush, including grooming and exercising him. However, we also assume that the activity had considerable personal and recreational aspects, even if some of the activities were mundane, arduous, or repugnant. That a business person derives pleasure from his or her work does not necessarily show a lack of a profit objective. <u>See</u> sec. 1.183-2(b)(9), Income Tax Regs.; <u>see also</u> <u>Jackson v. Commissioner</u>, 59 T.C. 312, 317 (1972). However, there is no indication of what work petitioner did on her horse activity that was beyond what she would have done if the activity was a hobby. <u>See</u> <u>Giles v. Commissioner</u>, T.C.

**[*17]** Memo. 2006-15. Petitioner no doubt continued to spend a significant amount of time on her horse activity during the years at issue; however, because the activity also had personal and recreational aspects, we find this factor neutral.

D. Expectation that Assets Used in the Activity May Appreciate in Value

"A taxpayer's expectation that assets such as land and other tangible property used in an activity may appreciate in value to create an overall profit may indicate that the taxpayer has a profit objective as to that activity." Giles v. Commissioner, T.C. Memo. 2005-28 (paraphrasing sec. 1.183-2(b)(4), Income Tax Regs.).

Petitioner argues that she believed that Goldrush would appreciate in value. However, by the first of the two years at issue, it had been more than eight years since Goldrush had competed or sired any foals. Goldrush was too lame for successful competition in any dressage competitions, which might have increased his value. Petitioner also explained that she believed she was blackballed by the dressage society and that no one would breed to Goldrush, further diminishing his value. Petitioner did not present any evidence that Goldrush had or would appreciate in value; and because he was the only significant asset of petitioner's horse activity, we find this factor weighs in favor of respondent.

[*18] E.   The Success of the Taxpayer in Carrying on Other Similar or
           Dissimilar Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that [she] is engaged in the present activity for profit, even though the activity is presently unprofitable."  Sec. 1.183-2(b)(5), Income Tax Regs.

Although petitioner has a long history of working with and showing horses, there is no indication in the record that petitioner's horse activity has ever been profitable.  Petitioner's previous lack of success in carrying on a similar profitable activity favors respondent.

F.   The Taxpayer's History of Income or Losses With Respect to the
     Activity

A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.  However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.  If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer * * * such losses would not be an indication that the activity is not engaged in for profit. * * * [Sec. 1.183-2(b)(6), Income Tax Regs.]

See also Engdahl v. Commissioner, 72 T.C. 659, 669 (1979) (holding that horse breeding has 5- to 10-year startup stage); Burger v. Commissioner, T.C. Memo.

**[\*19]** 1985-523, aff'd, 809 F.2d 355 (7th Cir. 1987).  For the two years at issue petitioner claimed a combined loss of $55,902.  Petitioner does not argue and we do not find that her horse activity was in or near the startup phase.  However, she contends that the losses stemmed from her testimony against her former business partner, Tom Valter, and her subsequent ostracism from the dressage community along with Goldrush's lameness and death which were unforeseen circumstances beyond her control.

Petitioner testified against Tom Valter in 1999, and Goldrush's lameness began in 1999.  By the years at issue, 2007 and 2008, neither her testimony nor Goldrush's lameness was a new or unforseen circumstance.  However, in 2008 Goldrush's death was an unforeseen circumstance.  Accordingly, this factor is neutral.

G.  The Amount of Occasional Profits, If Any, Which Are Earned From the Activity

"The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent."  Sec. 1.183-2(b)(7), Income Tax Regs.

**[\*20]** Petitioner presented no evidence that her horse activity was ever profitable. From 2004 through 2008 the activity had a net loss of $147,170. Petitioner had not bred or shown Goldrush from at least 1999 until his death in 2008, and except for her expensive Australian venture she did not discuss any other sources of income for her horse activity. We find this factor favors respondent.

> H.     The Financial Status of the Taxpayer

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Sec. 1.183-2(b)(8), Income Tax Regs. Petitioner earned a modest income from Tony Hoffman Productions, Inc. During the 2007 and 2008 tax years she earned $60,630, and $60,000, respectively. Petitioner did spend a significant amount of money on her horse activity. She also claimed substantial tax benefits which would have dropped her taxable income to zero for the years at issue. See McKeever v. Commissioner, T.C. Memo. 2000-288.

We agree that petitioner expended more money on her horse activity than she could prudently afford. Further, by funding the activity in part with loans, the hoped-for tax savings at issue in this case, and withdrawals from her retirement accounts, she has put herself in substantial financial jeopardy. See Helmick v.

[*21] Commissioner, T.C. Memo. 2009-220. Respondent, focusing on the substantial tax benefits and consistent history of losses, concludes it was not a for-profit activity. As was the case in McKeever, we believe there is some truth to both parties' assertions, but we do not fully accept either party's conclusion. We find this factor is neutral.

I.      Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. However, "We also note that a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. at 317.

Petitioner was an avid horsewoman and has ridden since she was 4 years old. "'[A]n enterprise is no less a "business" because the entrepreneur gets satisfaction from his work; however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity.'" Dodge v. Commissioner, T.C. Memo. 1998-89 (quoting Burger v. Commissioner, T.C. Memo. 1985-523). The record is sparse on the elements of petitioner's

[*22] personal pleasure related to her horse activity. Respondent therefore suggests that this factor is neutral, and we agree.

After considering all of the above factors, as applied to the unique facts and circumstances of this case, we conclude that for the specific tax years at issue petitioner's horse activity was not engaged in for profit within the meaning of section 183. Petitioner did not argue it, but the main theme of our analysis of the above factors was what a reasonable winding down of petitioner's horse activity would have been. It had been more than eight years since Goldrush had competed or sired any foals, and the above analysis shows that petitioner was no longer and had not in a long time been engaged in the horse activity for profit. Therefore petitioner is not entitled to deduct expenses related to her horse activity.

III.    Schedule C Interest Expense Deduction

Petitioner deducted $6,296 of interest expense on her 2008 Schedule C for her IT and Database Management Business. At trial she explained that it should have been deducted on the Schedule C for her horse activity. Because we found supra that petitioner was not engaged in her horse activity for profit, she is not entitled to this Schedule C interest expense deduction.

**[\*23]** IV.    Casualty Loss

Section 165(a) allows as a deduction any loss sustained during a taxable year and not compensated for by insurance or otherwise.  Section 165(c) limits the allowance of losses in the case of individuals.  Section 165(c)(3) allows as a deduction to an individual certain losses commonly referred to as casualty losses.  A casualty loss is allowable to a taxpayer for a loss of property not connected with a trade or business or a transaction entered into for profit if the loss results from "fire, storm, shipwreck, or other casualty, or from theft".[5]  See id.  Pursuant to section 165(h), the casualty loss deduction is allowed only to the extent that the loss from each casualty exceeds $100 and to the extent that the net casualty loss for the taxable year "exceeds 10 percent of the adjusted gross income of the individual" for that taxable year.

The amount of the casualty loss allowed under section 165 is the lesser of: (1) the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (2) "The amount of the adjusted basis prescribed" in section 1.1011-1, Income Tax Regs.,

_____

[5]We found supra that petitioner was not engaged in her horse activity for profit.

**[\*24]** "for determining the loss from the sale or other disposition of the property involved." Sec. 1.165-7(b)(1)(ii), Income Tax Regs.

Petitioner deducted a casualty loss on her 2007 Federal income tax return for the death of Goldrush.[6] Respondent argues that the death of Goldrush does not qualify as a casualty. We have previously explained that "the term 'other casualty' must be restricted to mean events of the same kind or the same characteristics as those specifically enumerated in the statute. The casualties enumerated are unusual, and unexpected events which are caused by a sudden or destructive force." Daugette v. Commissioner, T.C. Memo. 1977-56. In Daugette we found the death of the taxpayers' horse from colic was not a casualty loss because "the horse's death was not due to a sudden or destructive force and the cause of death was not an unexpected or unusual occurrence in horses" but was due to the horse's own inherent "physical weakness". In the case at hand, according to the veterinary hospital that treated Goldrush, he died because of the sudden occurrence of an "immune mediated disease." This Court and other courts do not allow "a casualty loss deduction for losses resulting for diseases." Maher v. Commissioner, 76 T.C. 593, 597 (1981) (and the cases cited thereat), aff'd, 680 F.2d 91 (11th Cir. 1982).

---

[6]As noted above, Goldrush died in 2008; therefore, this expense deduction should have been claimed on petitioner's 2008 Federal income tax return.

**[\*25]** Therefore petitioner is not entitled to a casualty loss deduction for the death of Goldrush.

V.     Schedule C Legal and Professional Expense Deductions

Section 162(a) provides a deduction for ordinary and necessary business expenses paid or incurred during the taxable year in carrying on any trade or business.  A trade or business expense is ordinary for purposes of section 162 if it is normal or customary within a particular trade, business, or industry, and is necessary if it is appropriate and helpful for the development of the business. Commissioner v. Heininger, 320 U.S. 467, 471 (1943); Deputy v. du Pont, 308 U.S. 488, 495 (1940).  In contrast, "personal, living, or family expenses" are generally nondeductible.  Sec. 262(a).

Petitioner incurred legal and professional fees in connection with a lawsuit against her homeowners association for failing to respond to the three complaints discussed in the facts.  During the years at issue petitioner worked full time for Tony Hoffman Productions, Inc., out of her home.  However, she never explained how the lawsuit was related to that work.  Therefore, petitioner is not entitled to an expense deduction for the Schedule C legal and professional fees.

**[*26]** VI.     Section 6662(a) Accuracy-Related Penalties

Respondent determined that petitioner is liable for the section 6662(a) accuracy-related penalty for 2007 and 2008 of $2,021.40 and $312, respectively. Pursuant to section 7491(c) respondent has the burden of production with respect to the accuracy-related penalty.

There is a section 6662(b)(2) "substantial understatement" of income tax for any tax year, in the case of individuals, if the amount of the understatement exceeds the greater of (1) 10% of the tax required to be shown on the return for the tax year or (2) $5,000. Sec. 6662(d)(1)(A). Section 6662(a) and (b)(1) also imposes a penalty for negligence or disregard of the rules or regulations.

For the purposes of the penalty, "'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). Under caselaw, "'Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), aff'g on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991).

**[\*27]** There is an exception to the section 6662(a) penalty when a taxpayer can demonstrate (1) reasonable cause for the underpayment and (2) that the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c)(1). Regulations promulgated under section 6664(c) further provide that the determination of reasonable cause and good faith "is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs.

Many of petitioner's past returns have been audited, and each time she was able to both substantiate her expenses and show that her horse activity was for profit. Therefore we find that she acted in good fath and it was reasonable for her to continue to report her activity in that manner (including her misplaced interest expense deduction). Petitioner also acted reasonably and in good faith even if naively in attempting to ascertain the fair market value of Goldrush for her casualty loss. Petitioner has previously been able to settle the issue of her legal fees; and because she believed that result carried over, it was reasonable and she acted in good faith with respect to those fees. Therefore, we find that petitioner is not liable for either of the section 6662(a) accuracy-related penalties.

**[\*28]** The Court has considered all of petitioner's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.