T.C. Memo. 2019-16

UNITED STATES TAX COURT

MARC L. MANCINI, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16975-13.                          Filed March 4, 2019.

<u>Yosef Yisroel Manela</u>, for petitioner.

<u>Paulmikell A. Fabian</u> and <u>Sarah A. Herson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Marc Mancini claims to have lost millions of dollars gambling.  He says the normal limits on gambling-loss deductions shouldn't apply to him because his gambling was a side effect of a prescription drug that over a short time caused him to lose the ability to control his impulses.  The

[*2] Commissioner says there's no proof of that, and even if there is, Mancini hasn't substantiated the amounts of his losses or shown that they qualify as casualty losses.

FINDINGS OF FACT

A.    Background

Marc Mancini worked hard and studied hard for many years. He made good money, saved carefully, and strategically bought Los Angeles real estate. He gambled occasionally, but only small amounts, and never more than $100 at a time.

In 2004 Mancini was diagnosed with Parkinson's disease. He received treatment from Dr. Mark Lew, a prominent neurologist and professor at the USC School of Medicine. In 2006 Dr. Lew prescribed Pramipexole (the generic name for Mirapex), a drug Dr. Lew had given patients in clinical trials even before it had received Food and Drug Administration (FDA) approval. Dr. Lew initially prescribed a very small dose for Mancini--0.375 mg a day. He gradually increased Mancini's dose, which by 2008 was 4.5 mg a day. The medicine worked, and Mancini's symptoms improved significantly.

But in 2008 Mancini started doing odd things. He vacuumed a lot and became compulsive about his cleanliness. He spent a week researching and

**[*3]** obsessing over which mattress to buy. He started falling asleep suddenly while driving. He had suicidal thoughts. And he started gambling--a lot.

At first it was just lottery tickets. Then he started going to casinos--especially the Venetian in Las Vegas and Morongo near Palm Springs. Then he moved to online gambling. That's where he says he suffered his biggest losses, though he didn't keep logs of his gambling activity. In 2008 Mancini told Dr. Lew that he had become still more compulsive and was gambling, but he minimized the extent of his gambling and said he had it under control.

This was not true. Over the next two years gambling wiped out all of his bank accounts and all but $10,000 of his retirement savings. In 2009 he also started selling his real estate for less than fair market value. He first sold a house he owned in Manhattan Beach to its tenants for a quick $995,000, when he believed the true value was closer to $1.2 million. Mancini says he liked the tenants but thinks he would've put the house on the open market if he'd been in his right mind. He also sold property in Massachusetts that he thought was worth $300,000 for only $90,000. He explained that, with this sale, he felt indebted to the buyer who had cared for his mother. He used the proceeds from both of these sales to pay gambling debts.

**[*4]** In 2010 Mancini's wife and daughter stepped in. They visited Dr. Lew and told him that Mancini had gambled away nearly everything he had. This surprised Dr. Lew because Mancini had told him things were under control. Dr. Lew took Mancini off Pramipexole, and the compulsive behaviors stopped. Mancini still gambles occasionally, but only to the limited extent he did before 2008.

B.     Pramipexole

Mancini isn't the only person who'd done weird things while taking Pramipexole. Pramipexole is a dopamine agonist, meaning it activates dopamine receptors in the brain. That helps Parkinson's patients control their movements, but can also affect the brain's executive function in a way that distorts risk/reward assessments. Pramipexole was approved by the FDA in 1997, and by the early 2000s there were reports of users' developing impulse control disorders (ICDs), which make sufferers unable to control their behavior despite negative consequences. The most common ICDs observed among Parkinson's patients taking Pramipexole were compulsive eating (Mancini gained about 40 pounds while on the drug), shopping, or gambling; and hypersexuality. By around 2008 the correlation between Pramipexole and these ICDs was widely accepted. Today physicians prescribing the drug closely monitor patients for signs that they're developing an ICD.

**[*5]** The incidence of these behaviors is tied to dosage, but not directly--they don't tend to occur until the dosage hits a certain level, though they can worsen as doses are maintained at or above that point. Not everyone on Pramipexole has these problems, but a major study suggests that the percentage of people who do is significant: According to the study, dopamine agonist users are 2½ to 3 times more likely than nonusers to develop an ICD. The ICDs tend to go away once the patients stop taking Pramipexole, although there can be residual effects.

When the FDA first approved it, Pramipexole didn't come with warnings about ICDs in general or gambling in particular. Today, however, it specifically warns that it can cause compulsive gambling.

C.    Pramipexole Lawsuits

Many, many people have sued Pramipexole's makers over the drug's side effects. Hundreds of individual cases have been consolidated into multijurisdiction litigation in the U.S. District Court for the District of Minnesota. See In re Mirapex Prods. Liab. Litig., 493 F. Supp. 2d 1376 (J.P.M.L. 2007) (transferring all Pramipexole cases); In re Mirapex Prods. Liab. Litig., 246 F.R.D. 668, 671 (D. Minn. 2007) ("several hundred" cases pending). One plaintiff who went to trial in 2008 received a jury verdict for $8.2 million. Charbonneau v. Boehringer Ingelheim Pharm., Inc., Civil No. 06-1215, Special Verdict (D. Minn.

[*6] July 31, 2008), ECF No. 321. Many other plaintiffs have reached confidential settlements. See In re Mirapex Prods. Liab. Litig., MDL No. 07-1836, 2012 WL 6840134, at *1 n.4 (D. Minn. Aug. 3, 2012) (report and recommendation), adopted in part, rejected in part, 2013 WL 140292 (D. Minn. Jan. 11, 2013).

Mancini joined such a case in December 2010. The court found that he should have known about the side effects by April 2008 and dismissed his case because he hadn't filed it within California's two-year statute of limitations. See Mancini v. Boehringer Ingelheim Pharm., Inc. (In re Mirapex Prods. Liab. Litig.), Civil No. 10-5009, 2013 WL 1703476 (D. Minn. Feb. 14, 2013) (report and recommendation); id. 2013 WL 1703510 (D. Minn. Apr. 19, 2013) (order adopting report and recommendation), aff'd, 912 F.3d 1129 (8th Cir. 2019).

D.    Mancini's Tax Returns

Mancini filed income tax returns while all of this was going on. He filed his 2008 return in October 2009 with the help of a preparer. On it he reported $149,000 in gambling winnings, deducted $149,000 for "Gambling Losses to Extent of Winnings," and claimed no casualty losses. On his 2009 return, which he filed in October 2010 with the help of a preparer, he reported $107,000 in

**[\*7]** gambling winnings, deducted $107,000 for "Gambling Losses to Extent of Winnings," and reported no casualty losses.

Mancini prepared his 2010 return himself using TurboTax. He reported $45,000 in gambling winnings, deducted $45,000 for gambling losses, and claimed a $603,000 casualty loss for "Investment Portfolio and Home." The Commissioner noticed the casualty loss and selected the return for audit.

Mancini wasn't done filing returns for 2008-10 though. In December 2012 he filed self-prepared amended returns for 2008 and 2009 directly with the IRS Appeals Office. On the amended 2008 return he claimed a $1 million casualty loss for "Investment Portfolio," which reduced his reported taxable income from $360,000 to –$640,000. On his amended 2009 return he claimed a $1.8 million casualty loss for "Investment Portfolio," which reduced his taxable income from $1.1 million to –$700,000.

E.    Audit, Petition, and Trial

In July 2013 the Commissioner issued Mancini a notice of deficiency (NOD) for 2010, disallowing the original $603,000 casualty loss and asserting a 20% section 6662(a) penalty on the alternate grounds of negligence or disregard of rules or regulations, substantial understatement of income tax, or substantial

[*8] valuation misstatement.[1]  Mancini timely petitioned our court.  In his petition Mancini said he had a "net operating loss that has not yet carried over from previous years," and that "[o]nce that loss carries over, it will offset any income * * * for 2010."

Mancini later gave the IRS Appeals Office an amended return for 2010, which his attorney had prepared.  On it he increased his 2010 casualty loss from $603,000 to $678,000.  He also carried forward and deducted the $1.4 million excess casualty losses he'd recently claimed for 2008 and 2009.  The Commissioner didn't accept or process this return.

Here's a table to help keep all these returns straight:

| | 2008 | 2009 | 2010 | 2008 Amended | 2009 Amended | 2010 Amended |
|---|---|---|---|---|---|---|
| Gambling winnings | $149,000 | $107,000 | $45,000 | $149,000 | $107,000 | $45,000 |
| Gambling losses | (149,000) | (107,000) | (45,000) | (149,000) | (107,000) | (45,000) |
| Casualty losses | - 0 - | - 0 - | (603,000) | (1,000,000) | (1,800,000) | (678,000) |
| Casualty loss carried forward | - 0 - | - 0 - | - 0 - | - 0 - | - 0 - | (1,400,000) |

---

[1] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

**[\*9]** We tried the case in Los Angeles.[2] At trial Dr. Praveen Kambam, a forensic psychiatrist, testified as an expert witness that Pramipexole had caused Mancini's compulsive gambling. The parties stipulated Forms W-2G, Certain Gambling Winnings, that show Mancini's gross winnings from the Venetian and Morongo casinos in 2008-10. The parties also stipulated computer-generated records from the Venetian that provide more detail about his activities there, but neither party called a witness to explain how to read them. No records from online gambling websites were introduced.

Mancini did try to introduce some spreadsheets that didn't indicate who had made them or when they were prepared. He said they somehow reflected the extent of the gambling losses he'd discussed with a revenue agent, which we explained was both hearsay and irrelevant to the Tax Court's *de novo* redetermination. We didn't admit them at trial, but Mancini nevertheless attached what appear to be the same spreadsheets to his reply brief, along with a letter between his attorney and the Commissioner's. The Commissioner moved to strike these attachments, and we said we'd address his motion in our opinion, which we do by striking them. They are still irrelevant.

---

[2] Mancini lived in California at all relevant times, so absent a stipulation to the contrary this case is appealable to the Ninth Circuit. See sec. 7482(b)(1)(A).

[*10] Although the Commissioner had asserted a penalty in the NOD, at trial he didn't introduce any evidence that he'd complied with section 6751(b)(1). See Graev v. Commissioner (Graev III), 149 T.C. 485, 493 n.14 (2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016). Mancini hadn't mentioned the penalty in his petition, but both parties said it was at issue in their pretrial memos and discussed it in their briefs.

OPINION

We will answer four questions:

- Did Pramipexole cause Mancini's compulsive gambling?

- If so, can Mancini deduct his disastrous compulsive gambling losses as casualty losses?

- Did Mancini substantiate those losses?

- Is Mancini liable for a section 6662(a) penalty?

We consider each.

I. Did Pramipexole Cause Mancini's Disastrous Compulsive Gambling?

This is a tax case, but the main factual question it raises is neuropharmacological: Was Mancini's compulsive gambling a side effect of

**[*11]** Pramipexole?  Answering this question requires us to evaluate the testimony of Mancini's expert, Dr. Kambam.

A.    Daubert

Expert testimony that's "help[ful to] the trier of fact" is admissible "in the form of an opinion or otherwise" if it's "based on sufficient facts or data," "is the product of reliable principles and methods," and is "reliably applied * * * to the facts of the case."  Fed. R. Evid. 702.  This standard applies to all specialized knowledge, see Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999), but it grew from the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993), which specifically addressed scientific evidence, see Fed. R. Evid. 702 advisory committee's note to 2000 amendment.  There, the Court stressed that judges should focus on "principles and methodology, not on * * * conclusions" when deciding whether evidence was "scientific".  Daubert, 509 U.S. at 595.  Toward that end, it suggested considering whether proffered theories have been tested, published in peer-reviewed journals, or widely accepted, as well as what any known error rates were.  Id. at 593-94.

We follow these standards too.  See, e.g., Trimmer v. Commissioner, 148 T.C. 334, 350-55 (2017); Boltar, LLC v. Commissioner, 136 T.C. 326, 334 (2011).  We have applied them to diagnoses, see Trimmer, 148 T.C. at 350-55, but we

**[\*12]** more often address them in connection with experts' valuation reports, see, e.g., Boltar, LLC, 136 T.C. at 332-40; Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, 2012 WL 371809, at \*11-\*13, aff'd, 744 F.3d 648 (10th Cir. 2014); Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104, 2005 WL 1111792, at \*112-\*120.

Before applying the Daubert factors we need to consider what the expert testimony is for. There are two possibilities: describing a general scientific principle or phenomenon or applying a scientific principle or phenomenon to the facts of the case. See David L. Faigman, John Monahan & Christopher Slobogin, "Group to Individual (G2i) Inference in Scientific Expert Testimony," 81 U. Chi. L. Rev. 417, 418 (2014) (describing these as "framework" and "diagnostic" evidence, respectively); see also Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 353-54, 354 n.8, 356 (2011) (distinguishing between systemic bias, prevalence of bias at individual employer, and effect of bias on putative class members). These two types of testimony often get blended together in a single expert's report or testimony. See Faigman et al., supra, at 424, 474-75. But it's important for us to distinguish between them because the Daubert factors apply a bit differently to each type. See id. at 420-21, 425, 474-76.

**[*13]** B.     <u>Pramipexole and ICDs</u>

Dr. Kambam, a board-certified psychiatrist and neurologist, testified about the side effects of Pramipexole in general--i.e., he gave "framework evidence." <u>See</u> <u>id.</u> at 424, 474-75.  He told us that Parkinson's affects movement because it decreases the number of neurons that produce dopamine.  He explained that Pramipexole treats Parkinson's because it's a dopamine agonist--essentially a substitute for natural dopamine that turns on dopamine receptors.

Dr. Kambam went on to say that Pramipexole doesn't just make the parts of the brain that control movement think they're getting more dopamine--it also has that effect on the parts of the brain that control "executive functions" like impulse control.  That's why people taking Pramipexole are 2½ to 3 times more likely than the average person to develop an ICD.  But that risk doesn't set in when doses are low; instead, it appears suddenly once doses reach a certain threshold level.  According to Dr. Kambam, the correlation between Pramipexole and ICDs is now generally accepted and has been since around 2008.

How does Dr. Kambam know all of this?  He didn't conduct the research that led to these conclusions.  Instead, his knowledge comes from reading

**[*14]** published studies--he even directly cited one during his testimony.[3]  He's qualified to give this "framework" testimony because his medical training makes him especially qualified to critique the validity of those studies' methodologies.  See Faigman et al., supra, at 445-46.  His "framework" testimony, then, was essentially a review of the relevant published scientific studies, an approval of the methodologies those studies used, and an assertion that the studies' conclusions are widely accepted in the scientific community.  See id.

His testimony is therefore somewhat like a review article--a type of academic publication that summarizes and critiques all of the existing literature on a specific topic.  See Thomas Mann, A Guide to Library Research Methods 66 (1987).  At trial we explained that we were already familiar with two review articles about Pramipexole's side effects:  Brendan J. Kelley, Andrew P. Duker, & Peter Chiu, "Dopamine Agonists and Pathologic Behaviors," Parkinson's Disease (2012), https://www.hindawi.com/journals/pd/2012/603631/; and Chris B. Aiken, "Pramipexole in Psychiatry:  A Systematic Review of the Literature," 68 J. Clinical Psychiatry 1230 (2007).  These say exactly what Dr. Kambam did:  Parkinson's patients taking dopamine agonists have a heightened risk of becoming

---

[3] That article was Daniel Weintraub et al., "Impulse Control Disorders in Parkinson Disease:  A Cross-Sectional Study of 3090 Patients," 67 Archives of Neurology 589 (2010).

[*15] compulsive gamblers, but that risk ends when they stop taking the drug.[4]
See Aiken, supra, at 1233-34; Kelley et al., supra, at 2-3.

Regardless of whether we rely on Dr. Kambam's testimony or consider the review articles directly, the evidence linking Pramipexole and compulsive gambling satisfies Daubert.[5]  Both the testimony and the articles show that numerous studies employing scientifically valid methodologies have tested and demonstrated a connection between Pramipexole and ICDs.  See Daubert, 509 U.S. at 593.  Those studies have been published in peer-reviewed journals, and their findings are generally accepted by the medical community.  See id. at 593-94.

The Commissioner doesn't point to any contrary framework evidence and hasn't given us any reason to question the evidence we have.  We therefore find

---

[4] Both Dr. Kambam's testimony and the review articles are also consistent with Dr. Lew's anecdotal testimony that he noticed some dose-related ICD onset in patients during the clinical trials for Pramipexole in the early 2000s.

[5] In this case Dr. Kambam succinctly summarized the existing literature's findings.  We note, however, that we can judicially notice facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  That includes facts related to scientific evidence.  For example, in Trimmer v. Commissioner, 148 T.C. 334, 353-54 (2017), we judicially noticed that the information and diagnostic techniques in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) met professional standards, had been subjected to peer review, and were widely accepted in the scientific community; i.e., we judicially noticed that the DSM-5 satisfied Daubert.  Once such a finding is made, there would seem to be no reason not to also judicially notice the information itself.

[*16] that a small but noticeable number of patients who take Pramipexole suffer a disastrous loss of inhibition.

### C. Mancini's Compulsive Gambling

Whether Pramipexole can cause ICDs, though, isn't what's at issue here. That was just a preliminary question we needed to answer before moving on to the ultimate fact we need to find: whether Pramipexole caused *Mancini's* disastrous compulsive gambling. See Faigman et al., supra, at 422-23.

Dr. Kambam opined that it did--i.e., he gave "diagnostic evidence." Id. at 424, 474-75. Unlike his framework testimony, which he was qualified to give because of his knowledge, his opinion about Pramipexole's effect on Mancini rests on his skill and experience as a diagnostician applying framework information to specific factual situations. Id. at 446-47. Dr. Kambam didn't treat Mancini; the facts to which he applied his knowledge of Pramipexole's effects came from Dr. Lew's reports. Those reports probably would've been inadmissible hearsay if Mancini had tried to introduce them directly, and the statements from Mancini and his family contained within the reports would've made a second layer of hearsay. But experts can give opinions based on inadmissible hearsay if the facts they relied on are of a type that "experts in the particular field would reasonably rely on * * * in forming an opinion on the subject," Fed. R. Evid. 703;

**[*17]** see Daubert, 509 U.S. at 595, and Dr. Lew's reports certainly meet this standard,[6] see Sementilli v. Trinidad Corp., 155 F.3d 1130, 1134 (9th Cir. 1998).

From Dr. Lew's reports Dr. Kambam knew that Mancini reached his peak Pramipexole dose in 2008 and went off the drug in 2010. He also knew from reviewing Mancini's gambling activities--another kind of hearsay--that Mancini's compulsive gambling occurred only between 2008 and 2010. Noting this correlation, and knowing that Pramipexole causes some people to develop ICDs when they reach certain dosages, Dr. Kambam drew the conclusion that Pramipexole caused Mancini to gamble compulsively.

Applying Daubert to "diagnostic" evidence is trickier than applying it to "framework" evidence. See Faigman et al., supra, passim. "Diagnostic" testimony applies general scientific principles to a specific case, and the conclusion is usually untestable. See id. at 448, 451-52. And, of course, opinions about individual litigants are unlikely to be the subject of peer-reviewed articles. That leaves us to consider whether the *process* by which Dr. Kambam reached his conclusion is reliable.[7] Id. at 452, 456. Here, that process was (1) knowing that

---

[6] Dr. Lew himself also testified to the specific facts Dr. Kambam relied on.

[7] It's okay that we only have one factor to consider when deciding whether his opinion is "scientific". Not all of the Daubert factors are pertinent to every

(continued...)

**[\*18]** Pramipexole can cause compulsive gambling, (2) noting that Mancini's own compulsive gambling perfectly coincided with his peak Pramipexole use, and (3) inferring that Pramipexole caused Mancini's compulsive gambling.  We think basic logic is a valid methodology under Daubert.[8]

That Pramipexole can cause compulsive gambling is clear, and we find that Mancini compulsively gambled only when his Pramipexole dose was at its maximum.  This hardly seems coincidental.  We therefore find it more likely than not that Mancini's compulsive gambling was a side effect of Pramipexole.

II.     Are Mancini's Gambling Losses Casualty Losses?

The Code says taxpayers can deduct nonbusiness losses that "arise from fire, storm, shipwreck, or other casualty, or from theft."  Sec. 165(c)(3).  Such losses are deductible only to the extent that they exceed $100 and 10% of a taxpayer's adjusted gross income, sec. 165(h)(1) and (2), and taxpayers must claim

---

[7](...continued)
case.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999); Union Carbide Corp. & Subs. v. Commissioner, T.C. Memo. 2009-50, 2009 WL 605161, at \*106, aff'd, 697 F.3d 104 (2d Cir. 2012).

[8] Basic logic is also, one would hope, not beyond the abilities of judges or juries.  For that reason, "diagnostic" testimony like this is often *less* helpful than the "framework" testimony it applies--after all, the factfinder has to make up his own mind about causation anyway.

[*19] the deduction for the year in which the loss actually occurred, sec. 165(a); secs. 1.165-1(d)(1), 1.165-7(a)(1), Income Tax Regs.

Neither the Code nor the regulations define "other casualty." But courts sensibly applying the canon of *ejusdem generis* have consistently held that the general term "other casualty" must mean something like the specific terms that precede it--"fire", "storm", and "shipwreck". See, e.g., Maher v. Commissioner, 680 F.2d 91, 92 (11th Cir. 1982), aff'g 76 T.C. 593 (1981); Torre v. Commissioner, T.C. Memo. 2001-218, 2001 WL 904250, at *3, aff'd, 52 F. App'x 965 (9th Cir. 2002); see also Pulvers v. Commissioner, 407 F.2d 838, 839 (9th Cir. 1969), aff'g 48 T.C. 245 (1967). As a result, an "other casualty" is a loss arising from something "sudden, unexpected, or unusual,"[9] see, e.g., Maher, 680 F.2d at

_____

[9] The caselaw contains numerous variations on this phrase. See, e.g., Coleman v. Commissioner, 76 T.C. 580, 589 (1981) ("sudden, unusual, unexpected, and accidental"); White v. Commissioner, 48 T.C. 430, 433-34 (1967) ("sudden, unexpected, violent and not due to deliberate or willful actions" by the taxpayers); Durden v. Commissioner, 3 T.C. 1, 3 (1944) ("undesigned, sudden and unexpected"). Some cases also use the term "cataclysmic," see Popa v. Commissioner, 73 T.C. 130, 132 (1979); Torre v. Commissioner, T.C. Memo. 2001-218, 2001 WL 904250, at *3, aff'd, 52 F. App'x 965 (9th Cir. 2002), but we've specifically held that "the magnitude of the casualty is not and should not be the controlling factor in determining whether a questioned event qualifies for casualty loss deduction treatment," White, 48 T.C. at 434. In White, for example, we allowed a casualty-loss deduction for the value of a diamond that popped out of an engagement ring and disappeared in a gravel driveway after a car door was accidentally slammed on the ring-wearer's hand. Id.; see also Rev. Rul. 72-592,

(continued...)

**[\*20]** 92; <u>Farber v. Commissioner</u>, 57 T.C. 714, 718 n.3 (1972); <u>Dubin v. Commissioner</u>, T.C. Memo. 1976-256, 35 T.C.M. (CCH) 1120 (1976); Rev. Rul. 72-592, 1972-2 C.B. 101, not from "progressive deterioration [due to] a steadily operating cause," even if the damage "was not discovered until it was complete," <u>Fay v. Helvering</u>, 120 F.2d 253, 253 (2d Cir. 1941). Taxpayers can therefore deduct losses for property damaged by blasting, <u>Durden v. Commissioner</u>, 3 T.C. 1, 5 (1944), or lost during the abrupt fall of Saigon, <u>Popa v. Commissioner</u>, 73 T.C. 130, 132-34 (1979), but can't deduct losses caused by the slower havoc wreaked by termites, <u>Fay</u>, 120 F.2d at 253, dry rot, <u>United States v. Rogers</u>, 120 F.2d 244, 246 (9th Cir. 1941), or disease, <u>Maher</u>, 680 F.2d at 93; <u>Coleman v. Commissioner</u>, 76 T.C. 580, 588-92 (1981).

Mancini argues that the ICD his Pramipexole caused fits this definition of an "other casualty." According to him, it was sudden because it manifested abruptly once his dosage reached a certain level, it was unexpected because neither he nor Dr. Lew anticipated it, and it was unusual, even for Pramipexole takers.

---

[9](...continued)
1972-2 C.B. 101. There we suggested that the $100 threshold would prevent taxpayers from deducting as casualty losses "everyday household and other losses which are less than cataclysmic in impact or scope." <u>White</u>, 48 T.C. at 436.

**[*21]** A.    <u>Physical Damage</u>

The Commissioner disagrees with these characterizations and also raises an important point:  A casualty loss is deductible only if the taxpayer's property suffered physical damage, and here there was none.  <u>See, e.g.</u>, <u>Furer v. Commissioner</u>, 33 F.3d 58 (9th Cir. 1994), 1994 WL 417425, at *1 ("loss must be the result of physical damage to property"), <u>aff'g without published opinion</u> T.C. Memo. 1993-165; <u>Citizens Bank of Weston v. Commissioner</u>, 28 T.C. 717, 720 (1957) (physical damage of property prerequisite), <u>aff'd</u>, 252 F.2d 425 (4th Cir. 1958); <u>Dubin</u>, 35 T.C.M. (CCH) at 1122 (same).  Mancini insists that these cases don't say what they do--he says they're each really about whether an event was a *casualty*, not whether physical damage to property was required for a casualty loss, and that their statements about what a casualty loss requires are therefore dicta.  It's a gallant attempt at hair-splitting, but it's also wrong.  Let's look at the caselaw.

The wellspring of precedent in this area is <u>Citizens Bank of Weston v. Commissioner</u>, 28 T.C. 717 (1957).  There, a flood ruined the records a bank kept in its basement, but didn't really damage the bank building itself.  <u>Id.</u> at 718-19.  The bank claimed a casualty loss, arguing that the risk that the basement could flood again reduced the building's market value.  <u>Id.</u> at 719.  We disallowed the

[*22] deduction because the flood neither damaged the building nor caused the taxpayer to abandon it. Id. at 720. We explained that whatever loss was suffered was due only to the fluctuation in the building's value, which wasn't a casualty loss. Id. at 719-20.

The Ninth Circuit applied the same reasoning in Pulvers, 407 F.2d 838, and Kamanski v. Commissioner, 477 F.2d 452 (9th Cir. 1973), aff'g T.C. Memo. 1970-352. In both those cases the taxpayers claimed casualty losses for drops in the value of their properties following mudslides that didn't actually damage the properties but did raise fears of future mudslides. Pulvers, 407 F.2d at 838-39; Kamanski, 477 F.2d at 452. In each case the Ninth Circuit disallowed the deduction because the mudslide hadn't physically damaged the taxpayer's property. Pulvers, 407 F.2d at 838-39; Kamanski, 477 F.2d at 452. In Pulvers the court specifically held that the types of losses section 165(c)(3) names--fire, storm, shipwreck, and theft--"surely involve[] physical damage or loss of the physical property," Pulvers, 407 F.2d at 839, and in Kamanski the Ninth Circuit disallowed the deduction because "[t]he loss in market value was not due to damage caused by the casualty [i.e., the mudslide]," Kamanski, 477 F.2d at 452.

The rule that a casualty loss requires physical damage to property has held fast through the decades. In Dubin, 35 T.C.M. (CCH) at 1120, a college student

[*23] was called to active duty after his parents had paid for his room and board. They got no refund, but they also got no deduction: The call wasn't unexpected and there was no physical damage to any property. Id. at 1122. In Furer, 1994 WL 417425, at *2, the Ninth Circuit affirmed our holding that financial losses the taxpayers suffered as a result of a stock market crash weren't deductible casualty losses because they "were the result of fluctuation in the market and not the result of any physical injury to the [taxpayers'] property." In Torre, 2001 WL 904250, at *3, we held that a taxpayer couldn't deduct as a casualty the loss he suffered from selling his house to escape racist harassment because the harassment was ongoing and not sudden, and the taxpayer "offered no evidence showing any serious physical damage or destruction to his property."[10] And in Pang v. Commissioner, T.C. Memo. 2011-55, 2011 WL 821182, at *3, we disallowed a bad driver's deduction for a wrongful-death settlement because, even though the car accident was a "casualty" and the payment the taxpayer had to make was a "loss", the loss wasn't due to physical damage to the *taxpayer's* property.

---

[10] We also explained that the taxpayer's "remedy from the harassment and vandalism * * * would be found in civil or criminal remedies, but not in the Internal Revenue Code." Torre, 2001 WL 904250, at *3 (quoting Kalbfleisch v. Commissioner, T.C. Memo. 1991-61).

[*24] In each of these cases we had to decide whether a taxpayer was entitled to a casualty-loss deduction, which necessarily meant we had to decide what the prerequisites for that deduction were. And each decision unequivocally held that physical damage to the taxpayer's property *was* a prerequisite of a casualty loss deduction. We'll follow suit.

Sixty-odd years of caselaw notwithstanding, Mancini argues that physical damage can't be a prerequisite of a casualty-loss deduction because, in general, the Code doesn't limit the definition of "property" to just physical assets. Mancini doesn't cite any cases that support this argument, and, as we've seen, the caselaw on casualty losses says the exact opposite. But he does cite something interesting: an IRS Publication that says a taxpayer can deduct as a casualty the "loss on deposits [that occurs] when a bank, credit union, or other financial institution becomes insolvent or bankrupt." IRS Pub. 547, Casualties, Disasters, and Thefts, at 4 (2017). This would suggest that physical damage to the taxpayer's property might *not* be required for a casualty loss.

Fortunately for the Commissioner, his own publications aren't the law. See, e.g., Stengel v. Commissioner, T.C. Memo. 1992-570, 1992 WL 235192, at *2, aff'd without published opinion, 996 F.2d 1227 (9th Cir. 1993). We have said, however, that we'll treat revenue rulings, which also aren't binding precedent, as

**[\*25]** concessions, and it's tempting to do the same with Publication 547 here.
See Rauenhorst v. Commissioner, 119 T.C. 157, 171-73 (2002). But even if we
did, that publication says only that taxpayers can claim as a casualty the "type of
loss" that occurs when a bank becomes insolvent or goes bankrupt, see IRS Pub.
547, at 4--it doesn't authorize casualty-loss deductions for decreases in bank
accounts generally. We're therefore not inclined to let Publication 547 upset
decades of caselaw from both our Court and the Ninth Circuit.

We do find that Mancini's brain was damaged by the Pramipexole, but
physical damage to property remains one of the prerequisites of a casualty-loss
deduction. Mancini's depleted bank accounts, and the money he left on the table
when he made bad real-estate deals, didn't suffer any physical damage. So, even if
the onset of his ICD was sudden, unexpected, and unusual, Mancini isn't entitled
to a section 165(c)(3) deduction for his gambling losses.

B.      Calculating a Casualty Loss

The lack of physical damage to any of his property isn't the only thing
standing between Mancini and a section 165(c)(3) deduction. The way casualty
losses are calculated also shows that the kind of losses he's claiming simply don't
qualify under section 165(c)(3). The regulations tell us that the amount of a
casualty loss is the fair market value of the property "immediately before the

[*26] casualty" minus the fair market value of the property "immediately after the casualty." Sec. 1.165-7(a)(2)(i), (b)(1), Income Tax Regs. This amount is reduced by any compensation received from insurance, see Farber, 57 T.C. at 718 (citing Helvering v. Owens, 305 U.S. 468, 471 (1939)), and can't exceed the taxpayer's adjusted basis in the property, see sec. 1.165-7(b)(2)(ii), Income Tax Regs. How would we apply this method to Mancini?

Mancini claims he suffered gambling losses over the course of three years. These losses were necessarily the result of dozens or hundreds of individual gambling sessions and probably thousands of separate wagers. And the property he claims he lost was the money in his bank accounts. How do we determine what the value of these accounts was "immediately before" and "immediately after" the casualty, which he says was the onset of his ICD? Assuming we had an exact date for that, we suppose we could treat the account balances on that date as the "immediately before" fair market value. Mancini, then, would need us to use the fair market value on the date he went off Pramipexole as the "immediately after" date--even though it was three years later.[11]

---

[11] Mancini would also have to show that the only withdrawals from his accounts during those three years went towards fueling his compulsive gambling, which we doubt would be possible. He'd also have to show his bases in the accounts he says were depleted. That might be feasible for cash he'd put into

(continued...)

[*27] What is more, a three-year-long casualty is not "sudden". A revenue ruling summarizing caselaw tells us that "sudden" means "swift and precipitous and not gradual and progressive." Rev. Rul. 72-592, 1972-2 C.B. at 101. Even if the onset of the ICD was "sudden," and even if Mancini didn't realize what was happening to his savings until three years later, the gambling losses grew gradually over time--Mancini himself is trying to deduct compulsive-gambling losses for three separate tax years. That makes the losses he sustained just like damage from slow-moving termites or dry rot, which can start without the taxpayer's knowledge and take years to discover, but isn't a casualty because the damage is not sudden. See Fay, 120 F.2d at 253.

Mancini's losses are simply not what the Code considers a "casualty". They progressed over the course of three years, and there was no physical damage to any of his property. Section 165(c)(3) allows the deduction of only specific types of losses--it's not a stand-in for all the types of damages that would be recoverable

---

[11](...continued)
regular savings or checking accounts but could be tricky for retirement accounts he made pretax contributions to, which could have zero bases. See Cohen v. Commissioner, T.C. Memo. 2004-227, 2004 WL 2251801, at *3.

[*28] in a civil action.  See Torre, 2001 WL 904250, at *3; Kalbfleisch v.

Commissioner, T.C. Memo. 1991-61, 61 T.C.M. (CCH) 1902, 1905 (1991).[12]

III.   Did Mancini Substantiate His Losses?

Even if we had found that Mancini's compulsive-gambling losses were

casualty losses, he could still deduct them only if he substantiated their amounts.

Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  On his 2010 return, Mancini

deducted a $603,000 loss.  But the records in evidence don't show losses

anywhere close to that amount.  His Forms W-2G from 2010 show that he won

$45,000, and the only other records of his gambling activity that we have are from

the Venetian and Morongo casinos.  No witness explained these records, and we

_____

[12] If his compulsive-gambling losses were deductible casualty losses, Mancini would also have to contend with section 165(d).  That section says gambling losses are deductible only to the extent of gambling winnings.  Mancini acknowledges that we've held that this limitation applies to professional gamblers because section 165(d)'s specific proscription takes precedence over section 162(a)'s general allowance of business-expense deductions.  See Valenti v. Commissioner, T.C. Memo. 1994-483, 1994 WL 534499, at *2.  But Mancini has two arguments for why section 165(d) wouldn't apply to him.  First, he says that section 165(d) and section 165(c)(3) are equally specific, so neither controls.  He also says that the public policy underlying section 165(d)--which is to discourage gambling--doesn't make sense for Mancini, whose gambling was involuntary.

These are interesting arguments.  But because we've determined that Mancini didn't have a casualty loss to begin with, they're not arguments we need to address.  We urge readers interested in the interplay of potentially conflicting subsections of a single statutory section to read RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 643-47 (2012).

[*29] can decipher only a few things about them. For example, both casinos' records contain the same information that's on Mancini's W-2Gs, and some pages of the Venetian records appear to list limo rides and other perks the casino gave him.

Ten pages of the Venetian records also appear to list individual slot machines that Mancini played. Each listing shows when and for how long Mancini played the machine and has entries for "coin in" and "coin out." We're not exactly sure how to interpret these; but even if we make the inferences most favorable to Mancini--that his winnings or losses from each machine are the differences between the total "coin in" and "coin out," expressed in dollars and not some other denomination of actual coin, and that all losses came directly from his accounts--the losses are far less than the $45,000 in winnings he reported from all gambling sources that year.

Mancini therefore hasn't shown by a preponderance of the evidence that he actually suffered the losses he claimed on his return. Therefore, as an alternative holding, even if his losses were the result of a casualty they still wouldn't be deductible.[13]

---

[13] Mancini thinks he still doesn't have a deficiency for 2010 even if we don't allow the casualty loss he claimed for that year. According to him, the

(continued...)

[*30] IV.   Is Mancini Liable For a Section 6662(a) Penalty?

The Commissioner determined a penalty against Mancini under section 6662(a), which imposes a 20% penalty on understatements that are substantial, see sec. 6662(b)(2), (d), or that are due to negligence or disregard of rules and regulations, see sec. 6662(b)(1), (c).  The Commissioner has the initial burden of production for penalties determined against individuals.  Sec. 7491(c).  He meets part of his burden for a substantial-understatement penalty here because Mancini's

---

[13](...continued)
excess casualty losses he claimed for 2008 and 2009 on the self-prepared amended returns he gave to the IRS Appeals Office carry forward and more than eliminate any income from 2010.  See sec. 172(a), (c).  Mancini thinks that neither we nor the Commissioner can question his entitlement to the carryforwards because the Commissioner already accepted the underlying deductions from 2008 and 2009.

But "the taxpayer bears the burden of establishing both the actual existence of net operating losses in the prior years and the amount of such losses that may be carried to the years at issue."  Keith v. Commissioner, 115 T.C. 605, 621 (2000); see also Rule 142(a); Lee v. Commissioner, T.C. Memo. 2006-70, 2006 WL 931925, at *3.  A return that merely claims a deduction isn't proof of that deduction, because it "only sets forth petitioner's claimed NOL and does not establish petitioner's entitlement thereto."  Lee, 2006 WL 931925, at *3 (citing Roberts v. Commissioner, 62 T.C 834, 837 (1974)).  We can therefore examine facts from those years, even though they aren't before us, because doing so is necessary to determine whether Mancini really does have losses to carry forward and apply against his 2010 deficiency.  Sec. 6214(b); Keith, 115 T.C. at 621; Lee, 2006 WL 931925, at *3.

Mancini's substantiation of the 2008 and 2009 compulsive-gambling losses he wants to carry forward is no better than his substantiation for his 2010 losses.  And even if it was, his losses weren't casualty losses, just as his 2010 losses weren't, which means they weren't deductible anyway.  Mancini's purported losses for 2008 and 2009 don't offset any of his 2010 deficiency.

[*31] deficiency is more than $5,000 and more than 10% of the tax he should've reported. See sec. 6662(d)(1)(A). The Commissioner also says that Mancini's failure to substantiate his purported casualty losses means that Mancini was negligent. See sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.

A.    Mancini's Defense

Mancini argues that he shouldn't have to pay the penalty because substantial authority supported his return position. He argues that the Commissioner "approved" the amended 2008 and 2009 tax returns that he gave to the IRS Appeals Office during the audit of his 2010 return and that he should therefore be able to treat as substantial authority the position he took on them--namely, that he was entitled to huge, unsubstantiated casualty losses from his compulsive gambling.

It's true that a taxpayer can escape an understatement penalty "if there is or was substantial authority" for how he reported his tax liability. Sec. 6662(d)(2)(B)(I); see sec. 1.6662-4(d)(1), Income Tax Regs. But the regulations list the types of authority taxpayers can rely on for purposes of this defense. Sec. 1.6662-4(d)(3)(iii), Income Tax Regs. That list includes the Code, regulations, tax treaties, revenue rulings, and court opinions, as well as a few other government-produced sources. Id. It doesn't include a taxpayer's own amended tax returns.

**[\*32]** B.    <u>Section 6751</u>

But Mancini still won't have to pay this penalty. Part of the Commissioner's burden of production on penalties is to show that they were "personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1); <u>see</u> <u>Graev III</u>, 149 T.C. at 493. The Commissioner didn't introduce any evidence of such approval, so we won't sustain the section 6662(a) penalty. <u>See</u> <u>Wheeler v. Commissioner</u>, 127 T.C. 200, 208, 210, 212 (2006), <u>aff'd</u>, 521 F.3d 1289 (10th Cir. 2008); <u>Ford v. Commissioner</u>, T.C. Memo. 2018-8, at \*6, <u>aff'd</u>, ___ F. App'x ___, 2018 U.S. App. LEXIS 31221 (6th Cir. Nov. 5, 2018).

<u>Decision will be entered under</u>

<u>Rule 155</u>.